1               IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3  QUINN BUTLER, Individually, and on    )   No. 09 C 5336
   Behalf of All Others Similarly        )
4  Situated, CHRISTOPHER SKILLIN,        )
   Individually, and on Behalf of All    )
5  Others Similarly Situated, JASON      )
   BARTH, Individually, and on Behalf of )
6  All Others Similarly Situated,        )
                                         )
7                     Plaintiffs,        )
                                         )
8            v.                          )   Chicago, Illinois
                                         )   April 12, 2011
9  AMERICAN CABLE & TELEPHONE, LLC and   )   10:15 a.m.
   PERRY C. MOORE,                       )
10                                       )
                      Defendants.        )   Hearing
11
                      TRANSCRIPT OF PROCEEDINGS
12           BEFORE THE HONORABLE MICHAEL T. MASON

13  APPEARANCES:

14  For the Plaintiffs:          BETZEN LAW OFFICE, LLC
                                 2863 West Leland Avenue
15                               Suite 1
                                 Chicago, Illinois  60625
16                               BY:  MR. ADAM J. BETZEN

17                               STEPHAN ZOURAS, LLP
                                 205 North Michigan Avenue
18                               Suite 2560
                                 Chicago, Illinois  60601
19                               BY:  MR. RYAN F. STEPHAN

20  For the Defendants:          SEYFARTH SHAW LLC
                                 131 South Dearborn Street
21                               Suite 2400
                                 Chicago, Illinois  60603
22                               BY:  MR. STEVEN J. PEARLMAN

23          TRACEY DANA McCULLOUGH, CSR, RPR
                  Official Court Reporter
24              219 South Dearborn Street
                      Room 1426
25             Chicago, Illinois 60604
                   (312) 922-3716

1 APPEARANCES CONTINUED;

2 ALSO PRESENT:      WILLENSON LAW, LLC
  For the Putative Class:  542 South Dearborn Street

3             Suite 610
             Chicago, Illinois  60605

4             BY:  MS. MARNI WILLENSON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  What I'd like you to do is go around the

2  table and around the room here and please identify yourself for

3  the Court and the court reporter and whether you're defendants

4  or plaintiffs or the objectors.  Why don't we start right over

5  here with you, Miss Willenson.

6      THE CLERK:  Do you want me to call the case?

7      THE COURT:  Yes, I think it would be a good idea,

8  Rosa, yes.

9      THE CLERK:  09 C 5336, Butler versus American Cable

10  and Telephone.

11      MS. WILLENSON:  Good morning, Your Honor.  Marni

12  Willenson on behalf of the putative class members, potential

13  objectors.

14      THE COURT:  Would you please spell your last name for

15  the record.

16      MS. WILLENSON:  Willenson, W-I-L-L-E-N-S-O-N.

17      THE COURT:  Thank you very much.  And you have with

18  you?

19      MS. WILLENSON:  I have with me Mr. Ramiro Perez,

20  P-E-R-E-Z, one of the objectors.

21      THE COURT:  Thank you.  And Mr. Perez is right back

22  there.  And it's my understanding that he does not speak

23  English very well.

24      MS. WILLENSON:  He would not speak English well enough

25  to testify in English.

1       THE COURT:  Okay.  Thank you.  Yes.  Thank you.

2       MR. PEARLMAN:  Good morning, Judge Mason.  Steven

3   Pearlman, P-E-A-R-L-M-A-N.  I am counsel for the defendants.

4       THE COURT:  Thank you.

5       MR. PEARLMAN:  I have with me, Your Honor, Mr. Robert

6   Crandall.  If you'd like to make your appearance for the

7   record.

8       MR. CRANDALL:  Robert Crandall.  I'm an expert

9   witness.  C-R-A-N-D-A-L-L.

10      THE COURT:  Thank you.

11      MR. BETZEN:  Your Honor, Adam Betzen on behalf of the

12  plaintiffs and putative class.  Last name B-E-T-Z-E-N.  Also

13  present with me in court today are the three named plaintiffs,

14  Quinn Butler, Christopher Skillin, and Jason Barth.

15      THE COURT:  Thank you.

16      MR. STEPHAN:  Good morning, Your Honor.  Brian

17  Stephan, S-T-E-P-H-A-N, on behalf of the plaintiffs.

18      THE COURT:  All right.  And, gentlemen, would you

19  please stand and introduce yourselves.

20      MR. SKILLIN:  Chris, Skillin, S-K-I-L-L-I-N.

21      THE COURT:  Thank you.

22      MR. BUTLER:  Quinn Butler, B-U-T-L-E-R.

23      THE COURT:  Thank you.

24      MR. BARTH:  Jason Barth, B-A-R-T-H.

25      THE COURT:  Thank you very much.  And these are two

5

```
1    externs here.  And what I'd like to know at this time is,
2    Miss Willenson, if any of these individuals are called to
3    testify, do you intend to question them?
4              MS. WILLENSON:  Yes, Your Honor.  You're referring to
5    the plaintiffs?
6              THE COURT:  I am.
7              MS. WILLENSON:  Yes, I would cross-examine each of
8    them.
9              THE COURT:  And the expert also?
10             MS. WILLENSON:  Correct.
11             THE COURT:  All right.  And for the plaintiffs are you
12   going to call these three named plaintiffs as witnesses?
13             MR. BETZEN:  We're prepared to, Your Honor.
14             THE COURT:  Even though we've got declarations from
15   them?
16             MR. BETZEN:  They would be largely repeating what they
17   stated about a year ago.
18             THE COURT:  Which I don't want to have done.  But
19   we'll see.
20             MS. WILLENSON:  Your Honor, I just want to be clear
21   that we would not call Mr. Crandall to testify.  If he's asked
22   questions, we would like the opportunity to cross-examine him.
23             THE COURT:  Sure.  I understand that.
24             MS. WILLENSON:  We would call the plaintiffs as
25   adverse witnesses.
```

1      THE COURT:  Okay.  And you intend to do that?

2      MS. WILLENSON:  If allowed.

3      THE COURT:  We'll see.  We'll see.  Okay.  And

4 yourself.

5      MR. PEARLMAN:  Your Honor, I am prepared and expecting

6 to direct examine Mr. Crandall and to cross-examine the three

7 named plaintiffs.

8      THE COURT:  And what about -- how do you pronounce his

9 name again, who's stuck in traffic?

10      MR. PEARLMAN:  Mr. Jonas.  My understanding is -- I am

11 not planning to call Mr. Jonas.  My understanding per the

12 Court's order is that the Court wasn't expecting that either.

13      THE COURT:  Did you have anything, Miss Willenson?

14      MS. WILLENSON:  For Mr. Jonas?

15      THE COURT:  Yes.

16      MS. WILLENSON:  No, Your Honor.

17      THE COURT:  It depends I assume.  And what I'm going

18 to do is I want to ask some individual questions of the

19 attorneys first off here.  And what I'm going to do is ask my

20 two externs to take all of the named plaintiffs here, Mr.

21 Perez, and Mr. Crandall and put them in various witness rooms

22 around here.  And then when we need to talk to them, we'll

23 bring them back in, okay.  All right.

24      So, gentlemen, if you would go with them.  I would say

25 put the largest group of three here in the jury room, Judge

```
 1   Hart's jury room.  Let's put Mr. Crandall in our attorney
 2   witness room, and we can put Mr. Perez in either -- are we
 3   going to use Judge Hart or -- Judge Hart's witness room.
 4            All right.  And if you want to explain to your client
 5   here that --
 6            MS. WILLENSON:  I'm about to speak to you in Spanish.
 7            THE COURT:  Okay.  Why don't you go up and talk to
 8   him.
 9            MS. WILLENSON:  I explained to him --
10            THE COURT:  Okay.
11            MS. WILLENSON:  -- that you were -- you would exclude
12   him.  I explained to him.  He understands.
13            THE COURT:  Okay.  Thank you.  And then we may come
14   and get him.  Does he understand English at all?
15            MS. WILLENSON:  Half.  Maybe.  It's not --
16            THE COURT:  So that's, that's not good.  He's not,
17   with all due respect, competent to partake in this hearing here
18   today.
19            MS. WILLENSON:  Well, to listen.
20            THE COURT:  Well, that's my question.  Does he
21   understand?
22            MS. WILLENSON:  He would certainly benefit from being
23   here.
24            THE COURT:  Well --
25            MS. WILLENSON:  Absolutely.  He'd understand -- Your
```

1    Honor, it takes less proficiency in a language to understand --
2    I mean, I'm saying the obvious, right.  But it takes -- he
3    understands a lot more than he can speak.
4           THE COURT:  Well, I don't know that.  Therefore, you
5    should have had an interpreter here.  But we can take that up
6    at another time.  And if we need to ask him any questions, then
7    we'll make sure that we have an interpreter, or you'll make
8    sure that you have an interpreter here.  Did you write down
9    Kevin's name, Kevin Devany?
10          MS. WILLENSON:  How does he spell the last name?
11          THE COURT:  D-E-V-A-N-E-Y I believe.  N-Y.  And we can
12   get you a phone number for him should there be a need for that.
13          MS. WILLENSON:  And I'm also aware of the list of
14   federally certified court interpreters that the Court uses.
15   Your Honor, I want the record to be clear that, I mean I'm very
16   familiar with his facility in English and Spanish.  And I would
17   not have brought Mr. Perez here if I thought it would be an
18   exercise in futility or he could not benefit from sitting here
19   without an interpreter.
20          THE COURT:  Does he read English?
21          MS. WILLENSON:  He reads some English.
22          THE COURT:  All right.  We have the attorneys here, so
23   I think the best thing to do is let you -- and move that
24   microphone over by you, if you would, sir.  And tap yours --
25   no, just leave it right by you so you can speak into it so we

1   can get it.  And would you tap, yours is working too.

2           MS. WILLENSON:  Am I being picked up on there?

3           THE COURT:  You probably won't be picked up.  So if

4   you would just speak up, that would be great.  And if we need

5   to have you bring the microphone over there, we'll have you

6   bring a microphone over there.

7           Before I ask any individual questions here, I want to

8   resolve something here.  And that was for both the plaintiff

9   and defense counsel.  As amended how many purported settlement

10  class members are there now?

11          MR. PEARLMAN:  Your Honor, I believe that there are

12  slightly north of 400, and I will get you the exact number.  I

13  believe, Your Honor, that there are 402.

14          THE COURT:  402.

15          MR. PEARLMAN:  Correct.

16          THE COURT:  And, Miss Willenson, do you have any

17  objection to the motion to clarify?

18          MS. WILLENSON:  No, Your Honor.

19          THE COURT:  And you have no complaint regarding the

20  402 number that I've been given?

21          MS. WILLENSON:  I have no knowledge one way or the

22  other whether that's accurate.

23          THE COURT:  So 402 is what we're going to assume here.

24  Counsel, do you have any discrepancy with that or any

25  disagreement with that?

1      MR. BETZEN:  No, Your Honor.  Our position's stated in

2   the motion.

3      MS. WILLENSON:  Your Honor, can we get any

4   clarification on how many in each subclass?

5      THE COURT:  Sure.  If he can give us that information.

6      MR. PEARLMAN:  I apologize.  I don't have that

7   immediately handy.  However, that is something that we can work

8   with Mr. Crandall to vet the data and get that to

9   Miss Willenson.

10      THE COURT:  Great.  Okay.  And, Miss Willenson, if we

11   forget to raise that later on when Mr. Crandall comes in, raise

12   it.

13      MR. PEARLMAN:  And if I may interject one thing, and

14   stop me if Your Honor doesn't find this relevant.  But although

15   there's 402 that span the class period, that doesn't mean that

16   there's 402 working at any given time.  It's north of --

17      THE COURT:  No, I understand that.

18      MR. PEARLMAN:  Okay.

19      THE COURT:  I understand that.  And do you have any

20   questions about that?

21      MS. WILLENSON:  No, that's clearly the case.

22      THE COURT:  And then these are the questions that I

23   want to ask the attorneys, and in particular I want to address

24   a couple of questions to you, Miss Willenson.  Would you tell

25   me how you arrived at your calculations.

1          MS. WILLENSON:  Well, Your Honor, we have a

2     calculation that we've -- there are two ways, two calculations

3     that we offered as what we called reasonable rough estimates.

4     And this was based on information that I had secured as counsel

5     for Mr. Perez in what was the Bonilla litigation before the

6     case was stayed.  These are the CSG TechNet data that were

7     produced by Comcast, which is the custodian of those data in

8     that litigation.  We secured that for the individuals that were

9     the three named plaintiffs at the time, Mr. Perez, Mr. Ellis,

10    and Mr. Bonilla.

11         For purposes of these proceedings, and actually before

12    that, for purposes of calculating Mr. Perez's damages and

13    advising him about his own claims and in filing the litigation

14    for him, I analyzed pay stubs that he had of his employment and

15    we took a look at that CSG TechNet data.

16         THE COURT:  Yes.

17         MS. WILLENSON:  Those data reflect the information

18    that now is most clearly expressed in the declaration of Kim

19    Hilton.

20         THE COURT:  Who's the former -- I realize she

21    graduated from law school.

22         MS. WILLENSON:  Correct.

23         THE COURT:  She was working for you at the time.

24         MS. WILLENSON:  She --

25         THE COURT:  Tell us how that process worked, please.

1    MS. WILLENSON:  How she came to do the calculations?

2    THE COURT:  Yes.

3    MS. WILLENSON:  In response to some of the information

4  in Mr. Crandall's declaration, I provided her with a copy of

5  the TechNet data that I had in my possession that came directly

6  from Comcast.  I gave her the original disk.

7    THE COURT:  How much information did you have that you

8  got from Comcast?

9    MS. WILLENSON:  All -- I believe it was all of the

10  TechNet data that they had on these three individuals.

11    THE COURT:  Okay.

12    MS. WILLENSON:  I'm thinking about the time period,

13  Your Honor.

14    THE COURT:  That's fine.  That's fine.  And is this a

15  potential witness here?

16    MR. PEARLMAN:  This is my partner William Dugan.

17    THE COURT:  Oh, okay.  That's fine.  He's not

18  participating, right?

19    MR. PEARLMAN:  No, Your Honor.

20    THE COURT:  Okay.

21    MS. WILLENSON:  It was not for the entire time of

22  their employment, Your Honor, and I'm having trouble recalling

23  whether it was for the entire -- what would be the entire

24  three-year limitations period from when we filed Mr. Perez's

25  claims.  But it was definitely for a significant portion of the

1  period of time that they worked as independent contractors.

2          THE COURT:  Can you provide the Court with that period

3  of time?

4          MS. WILLENSON:  Yes, Your Honor.  I believe we have

5  provided those data.  And I think Mr. Crandall actually looked

6  at those data.

7          THE COURT:  Okay.

8          MS. WILLENSON:  And before filing his supplemental

9  declaration.

10          THE COURT:  Okay.

11          MS. WILLENSON:  I'm fairly confident we filed that.

12          THE COURT:  Anything else besides that?

13          MS. WILLENSON:  That we relied upon?

14          THE COURT:  Yes.

15          MS. WILLENSON:  Well, certainly the testimony not only

16  of Mr. Perez and Mr. Ellis, but all the other --

17          THE COURT:  What do you mean by testimony?

18          MS. WILLENSON:  I'm sorry.  The information that those

19  workers have provided to me as their attorney.  I conducted

20  pretty extensive investigation prior to agreeing to represent

21  the workers in these objections, and to accept representation

22  of them as opt-n plaintiffs, putative opt-in plaintiffs in the

23  Bonilla litigation, as well as careful investigation of the

24  claims of Mr. Guzman and Mr. Jackson, who are members of the

25  putative employee subclass and who are not putative Bonilla

1   plaintiffs, and who I am representing right now only with

2   respect to these proceedings.  So I considered that testimony.

3   I considered --

4            THE COURT:  The --

5            MS. WILLENSON:  I mean -- I apologize.  I considered

6   the information that they gave me as part of our investigation.

7   I considered the TechNet data.  I considered --

8            THE COURT:  Where did they get their information from?

9            MS. WILLENSON:  Their experience working for the

10  employer.

11           THE COURT:  That was it?  Anything else?  Any other

12  outside information that you're aware of?

13           MS. WILLENSON:  Their experience would include all of

14  their communications with other workers, their observations of

15  the experience --

16           THE COURT:  While on the job?

17           MS. WILLENSON:  -- of other workers while on the job.

18           THE COURT:  Okay.

19           MS. WILLENSON:  I don't believe so, Your Honor, as far

20  as what their information is based on, what the workers'

21  information is based on.  It would be based on their own

22  experiences and their observations of the experiences of other

23  workers.  I would add that --

24           THE COURT:  Their observation of the experiences of

25  the other workers.

1    MS. WILLENSON:  Of other workers, of their colleagues.

2    THE COURT:  As opposed to their conversations with the

3  other workers?

4    MS. WILLENSON:  Both.  Both, Your Honor.

5    THE COURT:  Okay.  All right.

6    MS. WILLENSON:  And additionally, a number of them

7  have worked for other Comcast labor contractors, so they would

8  have that information, which would be relevant to the potential

9  liability of Comcast.

10   THE COURT:  Could you give me an example of the other

11 Comcast --

12   MS. WILLENSON:  The other labor contractors?

13   THE COURT:  Labor contractors, yes.

14   MS. WILLENSON:  And I want to be clear, I have talked

15 to other workers who are cable installers working for labor

16 contractors for Comcast that did not work for ACT; and,

17 therefore, are not part of these proceedings.  So I cannot with

18 certainty say which ones these workers worked for.

19   THE COURT:  How did that come into play then in your

20 calculations?

21   MS. WILLENSON:  Well, at the time that the information

22 was conveyed to me -- for example, Mr. Guzman worked for Front

23 Line, which is also the subject of litigation pending not

24 before Your Honor, but before this Court.  Similar claims.

25   THE COURT:  Who's that in front of?

1        MS. WILLENSON:  Judge Lefkow I believe, and I believe

2    it's Mr. Stephan's case, so he could verify that.

3        THE COURT:  Can you verify that, Mr. Stephan?

4        MR. STEPHAN:  Judge, we do have a case on behalf of

5    Front Line technicians pending in front of Judge Lefkow.

6    Presently there's a motion to dismiss that has been fully

7    briefed.

8        THE COURT:  Okay.  Finish.  I'm sorry.

9        MS. WILLENSON:  All right.  So their observations as

10   purported labor contract -- I'm sorry, purported independent

11   contractors for other Comcast labor contractors is evidence

12   material to the strength of the claims against -- that could

13   have been asserted in this case against Comcast on a joint

14   employer liability theory.  That is the same as the theory that

15   Mr. Stephan is asserting on behalf of the Front Line workers in

16   the case just referenced.  Or the case that those claims have

17   been asserted in in the litigation against Northstar

18   Communication, which I believe Your Honor is familiar with.

19       THE COURT:  Yes.

20       MS. WILLENSON:  Because there was a referral here.

21   Also filed by Mr. Stephan when the claims were amended to add

22   Comcast.  So that's how that would -- that's one of the ways

23   that that would factor in to the weight or credibility that I

24   would assign to information that the workers are giving me.

25       THE COURT:  Okay.  Anything else?

1      MS. WILLENSON:  Yes, Your Honor.  I considered

2  information that was conveyed to me by defense counsel in an

3  e-mail from Colin Connor, Mr. Pearlman's partner with -- that

4  disclosed the individual amounts that the objectors, my clients

5  would receive under the proposed settlement.  That was a

6  significant consideration in their determination of whether

7  even to object.

8      THE COURT:  Okay.

9      MS. WILLENSON:  In addition, I considered information

10  disclosed in that same e-mail about the total wages received

11  during the class period.  And that's in my declaration, Your

12  Honor.  It was about $1.4 million, and it was not clear which

13  period that was talking about that pertained to because there

14  was no definition of subclass period or the relevant time --

15  the phrase used was not defined in the settlement agreement.

16  So there was a lot of ambiguity about that, but you could apply

17  some of the information that I had received from Mr. Perez and

18  from other workers about the percentage of their wages that

19  were underpaid.

20      So say on a weekly basis, we calculated X hours of

21  overtime and 13.8 percent deduction for worker's compensation

22  coverage that was illegally deducted.  And some estimate of

23  their mileage which was not reimbursed; and, therefore, a de

24  facto wage deduction.  And we calculated, you know, that meant

25  an underpayment of X amount.  And we could then apply that to

1    the gross wages received by the entire class during the class

2    period to get again some rough estimate.

3              THE COURT:  And that's what you've got?

4              MS. WILLENSON:  That's what I have right now, Your

5    Honor.

6              THE COURT:  Okay.  And you gave this information to

7    this, is it Kimberly Hilton, who was a law clerk for you at the

8    time?

9              MS. WILLENSON:  She -- just to be clear, she was a

10   legal assistant for Brian Wood, who is an attorney who I lease

11   from.  It was his legal assistant, and she did this at my

12   request.  So, correct, she was working as my assistant, but she

13   wasn't employed -- she's not my employee and was not at the

14   time my employee.  She was Mr. Wood's employee.

15             THE COURT:  And had she had experience in doing this

16   before, do you know?

17             MS. WILLENSON:  I think she has extensive experience

18   doing this sort of analysis with Excel.  I've seen her do many

19   such analyses for Mr. Wood in class action cases, but she's not

20   a statistician.

21             THE COURT:  All right.  Does anybody have any

22   questions that they would like to ask Miss Willenson regarding

23   this line of inquiry that I've had?

24             MR. PEARLMAN:  Your Honor, Mr. Crandall will be

25   testifying.  Mr. Crandall submitted a supplemental declaration

1    which addresses the points that Miss Willenson --

2            THE COURT:  We'll get to that.

3            MR. PEARLMAN:  -- made.  Right.  And so while I do

4    have very serious disagreements with a number of the statements

5    that Miss Willenson made, those I think will --

6            THE COURT:  Well, that's why we're here, though.

7            MR. PEARLMAN:  Right.  Exactly.

8            THE COURT:  She's an objector.

9            MR. PEARLMAN:  Right.  Right.  And those issues will

10   be elicited through Mr. Crandall's testimony.  So rather than

11   my attempting to ask questions to my colleague in the bar

12   Miss Willenson, I thought it would be best appropriate to wait

13   for Mr. Crandall to testify.

14           THE COURT:  That's fine.  And that will give you a

15   chance to ask a lot of questions of Mr. Crandall also as well

16   as the plaintiffs, should you have any.  He was here for the

17   settlement conference that this Court held about a year ago I

18   think it was.

19           MR. BETZEN:  We're coming up very close on the

20   anniversary, yes.

21           THE COURT:  And for the class certification, class

22   counsel related inquiries that I'm going to make, with respect

23   to Mr. Butler's representation of the independent contractor

24   class, what's your basis for stating that defendant's payroll

25   practices did not change over night?

1      MR. BETZEN:  That would be based on a couple of

2  sources.  First upon the testimony, or not testimony, but based

3  on my interviews with my clients, including Mr. Butler and the

4  other two named plaintiffs who confirmed what he told us.  It

5  would also be based upon the production from defendant in

6  connection with this case, including various electronic payroll

7  data that showed how wage and hour practices evolved over time.

8  In addition to correspondence that we've had, correspondence

9  that was conducted in pursuit of settlement but is consistent

10  with my understanding of the facts up until then.

11      THE COURT:  Okay.  And, Mr. Stephan, is that the way

12  you pronounce it, like F?

13      MR. STEPHAN:  Yes, Your Honor.

14      THE COURT:  Would you clarify the dispute regarding

15  your membership of the trial bar for the Northern District of

16  Illinois.

17      MR. STEPHAN:  Sure.  Miss Willenson made a complaint

18  that I was not a member of the trial bar and had represented so

19  on my initial appearance.  Upon receipt of her complaint, I

20  went and looked.  At the time I had qualified or I had

21  satisfied all the criteria.

22      THE COURT:  Number of hours?

23      MR. STEPHAN:  Yes.  And what I did immediately

24  thereafter was I made a request to be admitted.  The day that

25  the request was made I was admitted.  So I've corrected the --

1          THE COURT:  When was that, do you know?

2          MR. STEPHAN:  It would have been within the last six

3    months.  Six to nine months.

4          THE COURT:  And I interrupted you.  I'm sorry.  So you

5    have corrected.

6          MR. STEPHAN:  I have corrected it.  Throughout the

7    time period of this case I did satisfy the criteria.  I had

8    overlooked filing my application.  As soon as I found out, I

9    corrected it.

10         THE COURT:  Okay.  All right.  And I'd like to know

11   from the plaintiffs if you would tell me please the amount of

12   discovery that has taken place in this case so far.

13         MR. BETZEN:  Your Honor, we have conducted document

14   discovery in this case.  So we received --

15         THE COURT:  And when did you undertake that?

16         MR. BETZEN:  We initiated document discovery I believe

17   in the end of '09, and I believe completed it -- it was ongoing

18   at the time of the settlement conference, but we received

19   documents into the first quarter of 2010.

20         THE COURT:  Anything else?

21         MR. BETZEN:  We received, as I stated I believe in

22   excess of 20,000 pages of documents related to work orders and

23   job performance with the defendant, in addition to electronic

24   payroll data covering a significant portion of the class

25   period.

```
 1          THE COURT:  How many hours did that take you?

 2          MR. BETZEN:  How many hours did it take to review the

 3   data?  I had previously submitted a statement in this.  I don't

 4   know if it was on file where I reviewed that.  Well, I guess I

 5   gave it a global amount of hours.  As I sit here today, I don't

 6   know exactly how many hours I have spent reviewing production,

 7   but it would be I would say close to a hundred hours.

 8          THE COURT:  And could you break that down by

 9   pre-settlement as well as post-settlement negotiations.

10          MR. BETZEN:  There's a majority of the review of

11   documents specifically.

12          THE COURT:  Yes.

13          MR. BETZEN:  Would have been pre-settlement

14   negotiations.

15          THE COURT:  Pre-settlement.  So it was prior to the

16   actual settlement conference that you had with this Court about

17   a year ago?

18          MR. BETZEN:  Yes, it would have been I believe prior

19   to the initial demand.

20          THE COURT:  Okay.  And for the defendants same

21   question.

22          MR. PEARLMAN:  Your Honor, Mr. Betzen's explanation

23   and representation is consistent with our understanding.  To

24   put a little bit of meat on the bones, over 20,000 separate

25   work orders were produced to plaintiffs' counsel.  That
```

1    represents a period of -- in excess of I believe 180 random

2    work weeks.  And payroll data, punch in/punch out data, credit

3    and expense data, personnel related data was also submitted.  I

4    believe Mr. Betzen left out one statement he had made to me

5    before, that he had interviewed a variety of different

6    individuals to learn their specific work experiences.

7              THE COURT:  How many?  Let me ask him that.

8              MR. BETZEN:  You know, I was trying to remember that

9    this morning.  It was right around -- over the course of the

10   case I've spoken with approximately 10 different class members.

11             THE COURT:  Including the three named --

12             MR. BETZEN:  Including the three named plaintiffs and

13   also including some of the people who are now represented today

14   as potential objectors.

15             THE COURT:  And how long did -- how many times did you

16   interview them, how long were the interviews, and who was with

17   you when you interviewed them?

18             MR. BETZEN:  That varied widely.  At times there were

19   discussions.  There have been obviously multiple and ample

20   discussions with the three named plaintiffs regarding their

21   experiences.  I can safely say I spent at least five hours with

22   each of them separately discussing their claims.  That's off

23   the top of my head a safe estimate.  I'm sure it's probably

24   more than that.  There have been a number of other individuals

25   who I have either met with or spoken to over the phone.

1      As I said, the total I'd say is approximately 10.

2  There was -- at one point I met with I believe four individuals

3  for a period of a couple hours to discuss their claims and

4  their potentially joining the case and interviewed them at that

5  time regarding their experiences with working for ACT.

6      THE COURT:  And no depositions have been taken?

7      MR. BETZEN:  No, Your Honor.

8      THE COURT:  Prior to or post?

9      MR. BETZEN:  Either.

10     THE COURT:  And is that true for the defendants also?

11     MR. PEARLMAN:  That is correct, Your Honor.

12     THE COURT:  Anything else that you want to add to what

13  he said?

14     MR. PEARLMAN:  I believe that's it, Your Honor.

15     THE COURT:  Okay.  And about the incentive payments

16  for the three named plaintiffs here, can you explain the

17  justification for the incentive payments for these individuals?

18     MR. BETZEN:  Consistent with my experience as

19  plaintiffs' class counsel, I think it's appropriate that named

20  plaintiffs be compensated for the time, expense, and exposure

21  that they undertake in engaging in being a named

22  representative.  I felt that the incentive payments that I

23  recommended were consistent with the amount of time that they

24  had into the case, in addition to the amount of risk that they

25  had undertaken in the case.

1         THE COURT:  Well, Miss Willenson strongly objects to

2   that and disagrees with that.  Am I correct in saying that?

3         MS. WILLENSON:  Yes, Your Honor.

4         THE COURT:  Let's go with Mr. Butler.  How much was

5   his incentive?

6         MR. BETZEN:  His incentive payment was $5,000 under

7   the terms of the agreement.

8         THE COURT:  All right.  And then let's go with the

9   other ones.  Tell me --

10         MR. BETZEN:  Mr. Skillin is to receive $5,000 under

11   the terms of the settlement.  Mr. Butler is to receive $10,000

12   under the terms of the settlement.

13         THE COURT:  And why is Mr. Butler entitled to $10,000

14   in your opinion.?

15         MR. BETZEN:  Mr. Butler is entitled to I believe more

16   than the other two based on two factors primarily.  One, that

17   he was involved in the suit from the beginning and had more

18   time in cooperating with the litigation and being the lead

19   named plaintiff.  Second, Mr. Butler had an individual claim

20   that was also part of the litigation based on a wrongful

21   termination claim.  I believe he deserves some compensation for

22   settlement of that claim as well.  I mean, that was included in

23   the settlement of the case.  It was a global settlement of

24   everything, and I believe he deserves some compensation for

25   that.

1    THE COURT:  All right.  As far as the risk, what's

2  your analysis of that?

3    MR. BETZEN:  I think the analysis of the risk requires

4  two separate issues to be addressed.  First is the likelihood

5  of class certification, and second is the likelihood of

6  total -- or final recovery.  I think we were -- to be candid, I

7  think the plaintiffs were more exposed.  In the challenges of

8  trying to overcome class certification, there were a number of

9  issues specifically regarding information I had received to

10  suggest that there was broad discrepancies in the amount of

11  work conducted by these people and the amount of value of their

12  off the clock claims.

13    This isn't the first off the clock case I've worked

14  on, but this one there was seemingly a very broad range of how

15  much time off the clock these individuals may have had.  So

16  there were some issues with regard to class certification that

17  concerned us.  If this were to be fully litigated, I have

18  contended from the beginning and still do today that it would

19  be proper to certify this for a class.  But in recognizing the

20  potential exposure, potential weaknesses, that was an issue

21  that had to be addressed.

22    With regard to the ultimate liability of the case,

23  this case -- there were such a variety of issues that given the

24  fact that there were multiple factors that we were pressing

25  forward on, whether it was deductions, improper deductions, or

1    whether it was off the clock time or whether it was unpaid

2    overtime, as the plaintiffs' counsel I feel somewhat more

3    confident in being able to preserve a claim to some recovery

4    when there are multiple different theories involved.  That

5    said, there were some theories in the case for which everything

6    available was on the paper, and they would be claims that could

7    be addressed in a summary judgment motion.  And we had to

8    consider the exposure of possibly not prevailing on a summary

9    judgment.

10        There were some legal issues with regard to whether

11   the deductions were or were not improper based on whether or

12   not proper paperwork was completed by the defendants and signed

13   by the class members authorizing such deductions.  That

14   ultimately I believe my analysis of it was that we felt that we

15   would have likely some recovery, but that there was the

16   possibility that recovery could be a lot less than we had hoped

17   for.  If we ran the table, we could have a good day, but I

18   don't -- under my analysis of it I never believed that we would

19   recover as much as the objectors are now suggesting is possible

20   even if we had an ideal outcome.

21        THE COURT:  And what do you make of the objectors'

22   contention that you failed to explore ACT's liability as

23   successor to Patriot Communications from 2006 to 2008?  And,

24   Mr. Pearlman, I'll asking you about that also.

25        MR. BETZEN:  I'll say at the outset that one of

1    reasons why we chose not to pursue claims against Patriot or

2    based on wages done -- or work done under Patriot was somewhat

3    a litigation strategy decision.  We felt that it was in the

4    best interest of the class not to pursue those claims.  That's

5    just a matter of strategy.

6              In addition to that, we felt that the value of the

7    claims was not enough to merit the complication that it would

8    add to the case of trying to bring in other previous corporate

9    entities.  And although I have not conducted thorough discovery

10   on this, my understanding is, and I'll let Mr. Pearlman address

11   it more thoroughly, but my understanding is that they have

12   strong defenses to that claim.

13             THE COURT:  I didn't hear that last part.

14             MR. BETZEN:  My understanding is that ACT will likely

15   have strong defenses to that claim.

16             MR. STEPHAN:  Judge, if I may add one thing to that as

17   well.  The initial lead plaintiff Quinn Butler never worked for

18   Patriot.  So at the time that the complaint was filed we didn't

19   have anyone that had worked for Patriot who could testify about

20   any claims that could be asserted against Patriot.

21             MS. WILLENSON:  And that remains true, Your Honor.

22   None of the three plaintiffs ever worked for Patriot.  They're

23   all short term -- you know, shorter, more recent employees.

24             THE COURT:  Mr. Pearlman.

25             MR. PEARLMAN:  Sure.  I think Mr. Betzen hit some of

1  the important points.  But I think Mr. Stephan's final point

2  was what I really was planning on starting off with.

3          THE COURT:  Go right ahead.

4          MR. PEARLMAN:  Because Mr. Butler never worked for

5  that entity nor did the other two plaintiffs.  So it struck me

6  as irrelevant to a determination of exposure in this case in

7  whether or not plaintiffs' counsel adequately investigated

8  their client's claims, because their client again never worked

9  for that entity.

10         Moreover, Patriot is a predecessor and a different

11 separate entity vis-a-vis ACT.  So when we look at the statute

12 of limitations period, we see that the amount of time that

13 there could potentially be any exposure for Patriot would be

14 exceedingly small.  But in any event, on the merits defendants

15 are confident that the independent contractor agreements that

16 Patriot had with folks, who again aren't even part of this

17 case, not only are accurate, but in practical terms they

18 reflect the severe lack of control over the method and means of

19 work of the independent contractors with whom that entity had

20 relationships.

21         THE COURT:  I want to go back to the area of

22 incentives again if I can.  And I need more clarification as to

23 each of these named plaintiffs here as to the incentive they

24 received.  And if you'd go over that one more time, please, and

25 try to give me a little more information if you can.

1      MR. BETZEN:  Yes, Your Honor.  One of the

2 significant --

3      THE COURT:  Which plaintiff was added right before the

4 settlement conference?

5      MR. BETZEN:  Mr. Barth.

6      THE COURT:  Okay.  Let's go directly to him.

7      MR. BETZEN:  Mr. Barth was recommended to receive a --

8 and Mr. Skillin.  This would apply to them both equally.  They

9 were recommended to receive an enhanced award in part because

10 they were both employed by ACT at the time of the settlement

11 conference and at the time of their joining the litigation.

12 And as a consequence, they did -- in addition to taking the

13 time and exposure of being involved in litigation, there was

14 the risk that they took on of potential retaliation for their

15 involvement in the litigation against their employer.  Without

16 seeking to disparage the defendants here, that is a risk that

17 all plaintiffs must consider when suing their current employer.

18      Furthermore, as plaintiffs' counsel, I believe the

19 compensation should address not only the work that was done,

20 but also the -- you know, the willingness to take on work that

21 may be required, given the fact that when they joined, they

22 weren't aware of whether or not this would settle.  They were,

23 all three plaintiffs were informed that there was the potential

24 that this case could go through to a trial and would involve

25 both depositions, participating in document discovery, and

1    testifying at trial.

2           And given the affidavits that have been filed by and

3    about Mr. Barth subsequent to the settlement conference, I

4    believe in hindsight it shows that, you know, even in his being

5    added shortly before the settlement conference, he's still been

6    involved and done significant work for this case.

7           THE COURT:  For instance.

8           MR. BETZEN:  Well, in addition to participating in the

9    interview I conducted of him prior to his joining the case, he

10   was involved in the settlement conference as Your Honor is

11   aware.

12          THE COURT:  Right.

13          MR. BETZEN:  He has filed at least one affidavit in

14   the case.  He has had I believe at least two or three other

15   affidavits filed about him.

16          THE COURT:  Is he going to be testifying about

17   anything?

18          MR. PEARLMAN:  No, Your Honor.  This is Mark Jonas.

19   He'll just be sitting with me if that's all right with Your

20   Honor.  Or actually if you'd like to exclude him as the other

21   witnesses, we're amenable, Judge.

22          THE COURT:  I think we should just in case.  So why

23   don't you put him -- we have a fourth room.  We have Judge

24   Finnegan's attorney witness room, so you can put him in there.

25   I'm talking to my externs now.  If one of you would take --

1       MR. PEARLMAN: I apologize for the interruption, Your

2 Honor.

3       THE COURT: I'm sorry.

4       MR. BETZEN: No, it's quite all right, Your Honor. To

5 finish where I left off, Mr. Barth's enhancement award would

6 also reflect the work that would necessarily go into finalizing

7 any settlement of a class, facilitating communication with

8 employees. Every named plaintiff I've ever worked with, you

9 know, always goes back to the office and tells people about

10 what's going on. In addition, to preparation for today or a

11 final fairness hearing and then taking the time off to be here

12 today.

13       THE COURT: Okay. Mr. Pearlman, can you -- I think

14 I'm asking the right person about this -- tell the Court a

15 little bit about the purchase of his vehicle --

16       MR. PEARLMAN: Sure.

17       THE COURT: -- by ACT.

18       MR. PEARLMAN: Sure. Your Honor, my understanding of

19 the information that's responsive to Your Honor's questions is

20 derived from the declaration of Mr. Jonas.

21       THE COURT: That's fine. Tell me what your

22 understanding is.

23       MR. PEARLMAN: Sure. My understanding is that well

24 before Mr. Barth was contacted by Mr. Betzen and being named as

25 a named plaintiff to this case, he had purchased --

1       THE COURT:  It's a white Chevy.

2       MR. PEARLMAN:  That's right.  It was a white Chevy.

3  And he believed that he felt pressure to have a white truck in

4  order to, you know, be consistent with ACT's fleet.  Mr. Barth,

5  as I understand it, was having very serious difficulty in

6  paying for the truck.  My understanding is that he spoke with

7  Mr. Jonas, the president of ACT, informed Mr. Jonas -- again,

8  this is before he was named as a plaintiff in this case -- told

9  Mr. Jonas of those economic difficulties.  Asked Mr. Jonas if

10 the company would consider purchasing the vehicle and adding it

11 to its fleet and allowing him to use it in connection with

12 performing and discharging his work duties.

13      Mr. Jonas responded that, you know, the company has

14 done this in the past for their employees.

15      THE COURT:  That was one of my questions.  But, you

16 know what, since Mr. Jonas is here, I know I just sent him out

17 of the room, but would you mind trying to get him back here.

18 And let's ask him.

19      MR. PEARLMAN:  Sure.

20      THE COURT:  Since he was the one who was involved with

21 this.

22      MR. PEARLMAN:  Sure.

23      MR. BETZEN:  And, Mr. Barth, has, you know, ample

24 recollection of this as well.  I've interviewed him about it

25 and can add some additional flavor to what counsel's stated.

 1          THE COURT:  Okay.

 2          MR. PEARLMAN:  May I grab him real quick.  He might be

 3  a little bit nervous because he didn't expect to testify.

 4          THE COURT:  Oh, sure.  Yes.  Yes.

 5          MR. PEARLMAN:  Okay.  Thank you.

 6      (Brief pause.)

 7          MR. PEARLMAN:  Your Honor, I have with me Mr. Mark

 8  Jonas.  May Mr. Jonas approach and sit in the witness seat.

 9          THE COURT:  Please.

10          MARK JONAS, DEFENDANTS' WITNESS, DULY SWORN

11          THE COURT:  Thank you very much.  And I just have a

12  few questions to ask you.  And I assume that there's a

13  potential that Miss Willenson who represents some other

14  individuals in this matter may want to ask you some questions.

15                      DIRECT EXAMINATION

16  BY THE COURT:

17  Q.  And what I'm talking about is your involvement, as I

18  understand it, with the purchase of Mr. Barth's truck, personal

19  truck that he bought.

20          Can you tell me a little bit about that, please, and

21  when it occurred to the best of your recollection.

22  A.  Sure.  I want to say sometime in January or February of

23  that year.  And I don't have specific dates in my head.

24  Q.  That's fine.  Okay.

25  A.  We purchase a lot of trucks.  Mr. Barth had approached me.

1    He was going through some financial hardships.

2    Q.   He bought the truck personally?

3    A.   He had bought the truck personally.

4    Q.   Okay.

5    A.   And he was in fear of losing it, getting repossessed.  And

6    he asked me if the company would be interested in buying it.

7    And the truck -- the specific make and model that he had is

8    right in line with the fleet trucks I've used.  We have two

9    types of --

10   Q.   Is it like a panel truck?

11   A.   No, it's a -- it's like a miniature pickup truck.

12   Q.   Okay.

13   A.   A Chevy Colorado I believe it was.

14   Q.   All right.  Yes.

15   A.   So we have Chevy Colorados and we have Toyota Tacomas.  So

16   I said, well, I'll take a look.  And if it's the right type of

17   deal, sure, because we're constantly adding to our fleet with

18   the turnover.  You know, we put a lot of -- you know, just a

19   lot of wear and tear on trucks so ...

20   Q.   Let me ask you a question about that.  Why would you buy

21   trucks when you make these installers, if you will, purchase

22   their own trucks?

23   A.   We don't.

24   Q.   You don't.

25   A.   We have both.

Jonas - direct by Court                                    36

1    Q.  You do?

2    A.  We have both.

3    Q.  So what's the criteria of when you need to have your own

4    truck or when you can use one of your trucks?

5    A.  It really comes down to availability.

6    Q.  Okay.

7    A.  You know.

8    Q.  And you didn't have one for him, so he went out and bought

9    his own or did he just want to buy his own?

10   A.  He had that before he came to work for us.  Yes, he went

11   out and bought his own.

12   Q.  He purchased it before he even came to work for you?

13   A.  I believe so.

14   Q.  Okay.  And this is something that you do for other --

15   A.  Sure.

16   Q.  -- people also?

17   A.  Yes, it's happened before.  Sure.

18   Q.  How many times?

19   A.  I don't know.  I mean, four.

20   Q.  Two, three, four?

21   A.  Yes, it could be four.

22   Q.  Okay.  Four times.

23   A.  Sure.

24   Q.  And how do you determine how much you'll pay them?

25   A.  Just looking at, you know, *Blue Book*.

1  Q.  *Blue Book*.

2  A.  Yes.

3  Q.  Okay.

4  A.  Just like buying a normal car.

5  Q.  And was there any discussion between you and Mr. Barth

6  prior to this or at the time of your purchasing the truck from

7  him about the lawsuit that was --

8  A.  No.

9  Q.  -- involved?  Or whether you were doing him a favor so he

10 would take a different stance regarding this lawsuit?

11 A.  No.  Absolutely not.

12         THE COURT:  Do you have any questions that you want to

13 ask?

14         MS. WILLENSON:  Yes, Your Honor.

15         THE COURT:  Briefly.

16                    CROSS-EXAMINATION

17 BY MS. WILLENSON:

18 Q.  I'm Marni Willenson, Mr. Jonas.

19 A.  Hi.

20 Q.  If your declaration indicates that this purchase occurred

21 around April, is that consistent with your recollection?

22 A.  Yes.

23 Q.  April of 2010?

24 A.  Yes.

25 Q.  And could you name any of these individuals that you bought

Jonas - cross by Willenson                                    38

1    trucks from or vans, vehicles?

2    A.  I have to go look.  I mean, we have a really high turnover,

3    so there's a lot of people that come through the door.

4    Q.  Okay.  But you can't recall the name of one other person

5    who approached you and said will you buy my truck?

6    A.  I couldn't remember last names right now, no.

7    Q.  I mean, Mr. Jonas, isn't it fair to say that this was a

8    favor that you did for Mr. Barth?  He asked you if you'd buy it

9    and you bought it for him?

10   A.  No, I don't think it was a favor.  It was a good deal for

11   us.

12   Q.  You didn't ask -- you didn't approach him and ask if you

13   could buy his truck, correct?

14   A.  No.  No.  Absolutely not.

15            THE COURT:  He approached you?

16            THE WITNESS:  Yes, he approached me.

17            THE COURT:  Okay.

18   BY MS. WILLENSON:

19   Q.  And after he approached you -- withdrawn.

20            After you purchased the truck from him, you then

21   allowed him to continue driving it, is that correct?

22   A.  While he worked for us.

23   Q.  Correct.  Without paying any rent for that vehicle?

24   A.  No.

25   Q.  Without paying rent or yes?

Jonas - cross by Willenson                    39

1  A.  Yes, he did not.

2  Q.  He did not pay rent?

3  A.  He did not pay rent.

4  Q.  Now, isn't it true that you have charged other employees

5  such as Mr. Bonilla to rent vehicles from you while they're

6  working for you?

7  A.  That was prior.

8  Q.  Prior to what?

9  A.  When we switched to go employee based.

10 Q.  Okay.  So the -- so when the workers were classified as

11 independent contractors, they had to pay if they were --

12 A.  Uh-huh.

13 Q.  -- using your vehicles?

14 A.  Uh-huh.

15 Q.  But subsequent to that --

16         THE COURT:  You can't say uh-huh.

17         THE WITNESS:  I'm sorry.

18         THE COURT:  It's just so she can hear you too.

19         THE WITNESS:  Yes.

20 BY MS. WILLENSON:

21 Q.  Subsequent to that you stopped charging them?

22 A.  I can't remember the exact date when we stopped charging

23 them, but we did away with that.

24 Q.  And isn't it true that Mr. Barth is working for you again

25 now?

Jonas - cross by Willenson

1   A.  He is now again, yes.

2   Q.  So there was a period of time after the settlement

3   conference he wasn't working for you and then he became

4   reemployed?

5   A.  Yes, he found another job.

6   Q.  And then -- he found another job.

7   A.  Uh-huh.

8   Q.  And then came back to work for you?

9   A.  Correct.

10  Q.  Do you recall when that was?

11  A.  It wasn't that long ago that he came back to work for me.

12  I don't think he's been back with us that long.

13          THE COURT:  Well, how -- could you give us a ballpark

14  figure.

15          THE WITNESS:  I really -- I mean, I really don't know.

16  BY MS. WILLENSON:

17  Q.  And after you purchased Mr. Barth's truck from him, did you

18  put his name on a list of former independent contractors who

19  might be willing to participate in the litigation?

20  A.  We gave a list of all of our independent contractors to our

21  attorneys.

22          MR. PEARLMAN:  I have to interject that the

23  conversations that I had with Mr. Jonas that it sounds like

24  he's about to delve into are starting to tread into privileged

25  area.

Jonas - cross by Willenson                41

1          THE COURT:  Make your objection.  I wasn't there.  I
2  can't tell you what was privileged and what wasn't.
3          MR. PEARLMAN:  Let me instruct you, Mr. Jonas, that
4  conversations that you had with your attorneys are privileged
5  and confidential.  And so I'll instruct you not to answer
6  questions that tread into that specific area.
7          THE WITNESS:  Okay.
8          THE COURT:  But, on the other hand, I can instruct you
9  that you have the authority to waive that privilege.
10          THE WITNESS:  Okay.
11          THE COURT:  But you don't have to.  You do have the
12  authority to do that.  Okay?
13          THE WITNESS:  Uh-huh.
14  BY MS. WILLENSON:
15  Q.  Okay.  So I'm just going to stick to the timing.  I
16  understand the concern.  Was it after you purchased his truck
17  that you put his name and others on a list?
18  A.  Yes, I'm not going to answer that.
19  Q.  Well, you can answer that unless you receive --
20          MR. PEARLMAN:  Actually that's privileged.
21          THE WITNESS:  That's privileged, yes.
22          MR. PEARLMAN:  That's privileged.
23          MS. WILLENSON:  No, I'm-- well, the Court can rule on
24  that.  Your Honor, I'm asking about the timing.
25          THE COURT:  Yes, how is that --

1          MR. PEARLMAN:  Mr. Jonas talking about putting

2   documents on a specific list that he gave to his counsel treads

3   into attorney/client privilege.

4          THE COURT:  Okay.  That will be sustained.

5          MS. WILLENSON:  Nothing more, Your Honor.

6          THE COURT:  No further.  Okay.  You can step down.

7   Thank you very much.

8       (Witness excused.)

9          THE COURT:  Now, do you need him for anything else?

10  There's going to be no question -- no further questions.  As

11  far as I'm concerned he can remain here.

12         MR. PEARLMAN:  Correct, Your Honor.  He will not be

13  testifying any further.

14         THE COURT:  Okay.  Did you have any questions?  I

15  forgot to ask you.

16         MR. BETZEN:  Not now, no.

17         THE COURT:  Okay.  All right.  Well, are you going to

18  have any of him?

19         MR. BETZEN:  No, that's fine.  Mr. Barth can testify

20  against --

21         THE COURT:  All right.

22         MR. BETZEN:  Regarding the same matters and I think

23  can fill in some of the blanks.

24         THE COURT:  Okay.  Thank you.

25         MR. BETZEN:  If need be.

 1          THE COURT:  Did you want him at counsel table with

 2     you?

 3          MR. PEARLMAN:  I would appreciate that, Your Honor, if

 4     that's okay, yes.

 5          THE COURT:  Sure.  We're finished -- I'm finished as

 6     far as asking any questions go of him at this time.

 7          MR. PEARLMAN:  Thank you, Your Honor.

 8          THE COURT:  And this again is directed to the

 9     plaintiffs here.  We've heard extensively from the objectors'

10     counsel Miss Willenson.  Am I saying your name correctly?

11          MS. WILLENSON:  Yes, Your Honor.

12          THE COURT:  Thank you.  And defendants' expert

13     regarding potential damages here.  I'd like to hear more about

14     your analysis of the available data and valuation of this case.

15          MR. BETZEN:  Yes, Your Honor.  I will testify to the

16     best of my recollection, it's been a while since I've done this

17     calculations.  Plaintiffs' counsel reviewed payroll data as

18     counsel stated earlier regarding wages paid, deductions made,

19     times in and out for the class both during the, what's now

20     being referred to as independent contractor period and also the

21     period we're now referring to as the employee period.  I

22     believe we covered -- we had data in electronic format that

23     covered approximately half of the -- not quite half of the

24     total periods covered in the class settlement period.

25          Of that analysis there was also analysis of off the

1    clock time, which was not exactly addressed from that data

2    because it was necessarily off the clock; and, therefore, there

3    would not be good hard data on that.  The analysis showed an

4    approximate number of total employees working at any given time

5    that would fall into the class.  And I think it makes sense to

6    break down in terms of because there is a high turnover in this

7    class, although there are 400 or so --

8         THE COURT:  402 I think is what --

9         MR. BETZEN:  402 class members now that the motion to

10   clarify has been resolved, we estimate there are approximately

11   about 50 people working at any given time.

12        THE COURT:  Okay.

13        MR. BETZEN:  So any given week.

14        THE COURT:  That was one of my questions.  So about 50

15   at any given time.

16        MR. BETZEN:  Yes.  And the length of employment for

17   people fluctuate dramatically.  There are a number of people in

18   the class who, you know, worked a month or two.  The average

19   turnover I believe was roughly around six months for a tenure

20   of an employee during this two plus year period.  We did

21   calculations based on a dollar amount -- what a total

22   settlement would be based on the dollar amount per week of off

23   the clock time.  Plus we analyzed the total deductions for the

24   class based on categories and looked at how those numbers would

25   then be extrapolated to the total class period.

1    Our estimates fluctuated somewhat from the information

2  that was presented by Mr. Crandall based largely on legal

3  theory I believe as to how we were applying law to facts.

4  Based on the numbers of people in the class and time worked,

5  total wages paid, my analysis came to a similar conclusion as

6  Mr. Crandall.  And I think that the discrepancies that we have

7  are largely based on the extent to what we were giving credit

8  for for deductions and also the amount of credit we were giving

9  for off the clock periods.

10    THE COURT:  In your analysis were you able to

11  determine how many of these installers -- or what's the other?

12    MR. PEARLMAN:  Disconnectors.

13    THE COURT:  Disconnectors left the employ of ACT and

14  then came back?

15    MR. BETZEN:  I did not conduct that specific analysis,

16  no.  I don't believe it was relevant to the calculations.

17    THE COURT:  Did you, Miss Willenson?

18    MS. WILLENSON:  Analyze how many people left?  Your

19  Honor, I don't have access to any class wide data.

20    THE COURT:  Or that came back.  Did you get any of

21  this information from your clients?

22    MS. WILLENSON:  We have no way of assessing --

23    THE COURT:  No, I didn't ask you if you had any way of

24  assessing it.

25    MS. WILLENSON:  No, I didn't --

```
 1           THE COURT:  Did you get any of that information from
 2   your clients?
 3           MS. WILLENSON:  No, Your Honor.  I have not received
 4   any -- my clients do not have any foundation to offer
 5   information about numbers of people.
 6           THE COURT:  Did any of them work there, leave, and
 7   come back that you know of, or that you recall?
 8           MS. WILLENSON:  I do not believe so, Your Honor.
 9           THE COURT:  Okay.  That's fine.  If it changes, let us
10   know.
11           MR. PEARLMAN:  My understanding from conferring with
12   my client is that some of the potential objectors left and came
13   back to work at the company.
14           THE COURT:  Okay.
15           MS. WILLENSON:  I'd be interested in hearing who they
16   are.
17           MR. PEARLMAN:  Andrew Cabin for one.
18           MS. WILLENSON:  That's possible.
19           THE COURT:  Okay.  All right.  What I'd like to do now
20   is have you get Mr. Barth, please.
21           MR. BETZEN:  Sure, Your Honor.
22           THE COURT:  Bring him in.  He's with the group of
23   three.
24           MR. BETZEN:  You're just letting him testify regarding
25   the sale of the truck or just generally?
```

1    THE COURT:  Just regarding the sale of the truck.

2    JASON BARTH, PLAINTIFFS' WITNESS, DULY SWORN

3    DIRECT EXAMINATION

4    BY THE COURT:

5    Q.  Mr. Barth, I have some questions that I'd like to ask you.

6    Please be seated.  Speak up so everybody can hear you.

7    A.  I'll try.

8    Q.  Mr. Barth, one of the areas that I want to talk about with

9    you, and I think it's the only area that I'm particularly

10   concerned about, is your purchasing the white Chevy.  What kind

11   of truck was it?

12   A.  A Colorado.

13   Q.  Colorado.  When did you purchase that to the best of your

14   recollection?

15   A.  Summertime 2009.

16   Q.  Before you became employed by ACT?

17   A.  No, after I was already employed.

18   Q.  After you were employed by them?

19   A.  Yes.

20   Q.  And why did you purchase that truck?

21   A.  I was led to believe at the time that if we did not have a

22   vehicle that matched in similarity to the company's fleet, that

23   we were going to end up losing our employment.

24   Q.  And who led you to believe that?

25   A.  Operations Manager Bill Fenton and some of the other

Barth - direct by Court                                    48

1   managers at the time.

2   Q.   Okay.  Did they ever indicate that they had any trucks that

3   you could use?

4   A.   With my driving record I was uninsurable on a company

5   policy.

6   Q.   Okay.  I remember that.  And so you purchased this truck

7   with your own funds?

8   A.   Financed, yes.

9   Q.   Financed.  Okay.  And then you had reached a point, as I

10  understand it, where you were unable to keep up the payments?

11  A.   Correct.

12  Q.   And with that, who did you go to at ACT to see if they

13  would purchase the truck from you?

14  A.   I spoke directly with Mark Jonas.

15  Q.   Okay.

16  A.   Because I knew he was the one to go to on it.

17  Q.   How did you know that?

18  A.   Well, he's the owner of the company.

19  Q.   He is.  Okay.

20  A.   The other managers didn't have --

21  Q.   The authority to do that?

22  A.   -- the authority to do something like that.

23  Q.   So he's the one that makes the final say on that, is that

24  what you're saying?  Has the final say?

25  A.   From my understanding, yes.

1   Q.  Okay.  That's all I want to know is what your understanding

2   is, your knowledge as of this.

3         All right.  And tell me how you approached him and

4   what was discussed, please.

5   A.  I had originally spoke to him about the truck, telling him

6   we can no longer afford it.

7   Q.  We being who?

8   A.  Me and my wife.

9   Q.  Okay.

10   A.  Payments were getting behind.  It was getting close to

11   repossession.  And, you know, asked if the company was looking

12   at buying other trucks, if he could consider buying mine off of

13   me before going to a dealer, because it's, you know, like the

14   rest of the trucks.  It's already been used for the company.

15   It's already outfitted.  And it was --

16   Q.  What do you mean by outfitted?

17   A.  It had a cap put on it.

18   Q.  A what?

19   A.  A contractor cap.

20   Q.  Okay.

21   A.  On the bed.

22   Q.  All right.  And what else?  I'm sorry.

23   A.  That was about it.

24   Q.  Okay.  And so they purchased it back from you?

25   A.  After a few months of going back and forth with finance

1   companies and whatever, he ended up -- it ended up getting

2   finalized and they purchased it.

3   Q.   And then did you continue to use that truck afterward?

4   A.   Yes.   We found a way for me to continue to use a company

5   vehicle, but I had to maintain my own insurance on it.

6   Q.   Oh, okay.

7   A.   So if something happened I was still insured.   But I still

8   had the company vehicle.

9   Q.   Did you have to pay them any rent for the use of that

10  vehicle?

11  A.   Not that I recall.   I could be incorrect.   I don't

12  remember.

13  Q.   Okay.   All right.   Was that part of your negotiation?   Do

14  you know?

15  A.   No --

16  Q.   I'm not asking you to guess.   Just tell me what you

17  actually know.

18  A.   No, the only thing that was -- that I recall was that I

19  would be able to remain using that vehicle for work but I had

20  to maintain my own insurance.

21  Q.   Okay.

22  A.   Just in case something were to happen.

23  Q.   Was anything promised to you or offered to you as a result

24  of your selling the truck to ACT?

25  A.   No.

1   Q.   And were you aware of the lawsuit that we're talking about

2   here today at that time?

3   A.   Not when we dealt with the truck.

4   Q.   And I understand your name was put on a list that was

5   turned over to the lawyers.  Am I correct in that, Counsel?

6         MR. PEARLMAN:   I am not sure whether Mr. Barth would

7   be aware of my communications with Mr. Jonas.

8         THE COURT:  Okay.  All right.  That's fine.

9         MR. PEARLMAN:  But that is correct.

10        MR. BETZEN:  And any knowledge he would have of that

11  would be based on communications he had with me.

12        THE COURT:  All right.  That's fine.

13        THE WITNESS:  I don't know how he got my number.  He

14  just called me one day.

15  BY THE COURT:

16  Q.   And what they're trying to convey to you is any

17  conversation that you've had with your attorneys regarding this

18  here is privileged conversation, and you can exercise that

19  privilege by refusing to answer.  On the other hand, you can

20  also waive that privilege.  You yourself have the power and the

21  ability to waive that privilege, and you could answer should

22  you choose to do so.  Just so you're aware of that.  But nobody

23  can force you to answer.  Understood?

24  A.   Yes.

25  Q.   So was anything promised you once you got involved in this

Barth - direct by Court                    52

1  lawsuit?

2  A.  No.

3  Q.  Once you reached the settlement agreement, was anything

4  promised you?  Were you working at the time when we were

5  involved in the settlement agreement?

6  A.  Yes.

7  Q.  And when did you leave the company?

8  A.  I had left the company in July of last year.

9  Q.  Okay.

10  A.  To pursue a career in which I'm going to school for, and

11  that didn't pan out.  So I am currently employed with the

12  company again.

13  Q.  You went back with them.  When did you go back with them?

14  Do you recall?

15  A.  We had talked November, December.  I think I officially

16  started again in January of this year.

17  Q.  Of this year?

18  A.  Yes.

19      THE COURT:  Do you have any questions?  I'll let you

20  ask and then if any of the others have any questions.  So, Miss

21  Willenson.

22      MS. WILLENSON:  Yes, Your Honor.  I have a number of

23  questions.  They do not pertain necessarily to the purchase of

24  the truck, but rather to what he alluded to, which is the

25  conversation with Mr. Betzen when he received a phone call

Barth - cross by Willenson                53

 1  about being a plaintiff in the case.

 2              THE COURT:  The conversation with his attorney?

 3              MS. WILLENSON:  No, Your Honor.  At the time this was

 4  not -- he was not seeking legal representation, Your Honor.  At

 5  least that's what he began to say, and I believe that's what we

 6  would establish.  Rather, it was a conversation initiated by

 7  Mr. Betzen in search of a plaintiff who could represent the

 8  class --

 9              THE COURT:  Well, it has nothing to do with the truck.

10  So are you planning on calling him yourself?

11              MS. WILLENSON:  Absolutely, Your Honor.

12              THE COURT:  Okay.  You have no questions regarding the

13  sale of the truck?

14              MS. WILLENSON:  No, Your Honor.

15              THE COURT:  All right.  Okay.  Even after all the

16  allegations that you made in your filings?

17              MS. WILLENSON:  I believe that the testimony is

18  consistent with what we've -- actually I do have one question,

19  Your Honor.

20                        CROSS-EXAMINATION

21  BY MS. WILLENSON:

22  Q.  Was the purchase price of the truck the amount due on the

23  outstanding note?

24  A.  It was the price of the loan.  I actually ended up losing

25  money on the truck.

1   Q.  Correct, it was the price of your loan?  Is that right?

2   A.  Yes.

3           MS. WILLENSON:  All right.  Your Honor, so --

4           THE COURT:  Do you understand the question?

5           THE WITNESS:  Yes, the purchase -- what Mr. Jonas or

6   ACT paid for my truck --

7           THE COURT:  Yes.

8           THE WITNESS:  -- was exactly to the penny what was

9   owed to my finance company.

10          MS. WILLENSON:  That is what we've said in the

11  evidence we have submitted, Your Honor.

12          THE COURT:  Okay.  You still rely on your statement

13  that he received favorable treatment here?

14          MS. WILLENSON:  Absolutely.

15          THE COURT:  Okay.  All right.  Now, tell me the line

16  of questions that you want to go into.  Before you do that, do

17  you have any questions, Mr. Pearlman, that you'd like to ask of

18  him?

19          MR. PEARLMAN:  I just have one.

20                       CROSS-EXAMINATION

21  BY MR. PEARLMAN:

22  Q.  Mr. Barth, what is your reaction to the suggestion that you

23  were bought off by ACT to make this settlement go through in

24  this case?

25  A.  I was extremely offended.  That I -- that's a shot at my

1  character, and I don't like it.  I don't stand for it.  I have

2  personally looked and spoke to other attorneys regarding that,

3  but it wasn't said in court on the record, and there's no

4  repercussions that I can bring against her for defamation or

5  anything else.

6           THE COURT:  Well, we don't need to go into that.

7  You've made your point.

8           MR. PEARLMAN:  Thank you.

9           THE COURT:  Okay.  Do you have any questions, Mr.

10 Betzen?

11          MR. BETZEN:  Just a few things I want to add to

12 clarify.

13                         CROSS-EXAMINATION

14 BY MR. BETZEN:

15 Q.  Could you explain -- you stated I believe that you were

16 falling behind on the payments on the truck.

17 A.  Yes.

18 Q.  Could you explain why that was.

19 A.  At the time from my understanding the deal between ACT and

20 Comcast was we were doing nothing but trouble calls at that

21 point in time and --

22          THE COURT:  As opposed to installations?

23          THE WITNESS:  As opposed to installations.  Now,

24 trouble calls, to do a route of trouble calls you have to do

25 about twice as much to make the same amount of money.  So as

1   the workload got tougher and we were going into the winter, the

2   income went down.  So I wasn't bringing as much home to where

3   we had to concentrate on our mortgage, our personal vehicles.

4   And then a work vehicle was the last thing that we can try and

5   make happen.

6   BY MR. BETZEN:

7   Q.  And I just want to clarify.  You stated earlier you had

8   approached Mr. Jonas about ACT purchasing the vehicle.  Do you

9   recall when that was?

10  A.  It was the winter '09, '010.  I don't remember if it was

11  before Christmas or if it was just after, but I know it was

12  right in that time because we were really tight on money.

13        THE COURT:  When you say we were, you mean you and

14  your wife?

15        THE WITNESS:  I'm referring to me and my wife, yes.

16        THE COURT:  Okay.

17  BY MR. BETZEN:

18  Q.  During the period that you owned title to the vehicle, did

19  you only use it for work purposes?

20  A.  Yes.

21  Q.  That's for ACT?

22  A.  Correct.

23  Q.  And after you sold title to the vehicle to ACT, you

24  continued to use it?

25  A.  Yes, for work.

Barth - cross by Betzen

1   Q.  And did you use that consistent with their fleet policy for

2   the other vehicles they owned?

3   A.  Yes, I did.

4         MR. BETZEN:  I have nothing further.

5         THE COURT:  Thank you.  Now, Miss Willenson, tell me

6   what it is that you want to go into here with questioning Mr.

7   Barth.  And was it involved in his declaration?

8         MS. WILLENSON:  No, there's no testimony in his

9   declaration about how it is that he became a plaintiff in this

10  case the day before the settlement conference, Your Honor.  And

11  if you'd permit me to ask questions about that, we would very

12  much like to do that.

13        THE COURT:  We'll see where you're going, but we're

14  not going to have a full blown trial on that.  I'll let you

15  touch that area.

16        MR. PEARLMAN:  And, Your Honor, if I may just for the

17  record interject, although I do want to reiterate Mr. Betzen's

18  point and my point that those communications tread into

19  privileged areas.

20        THE COURT:  Well, and Miss Willenson is saying they

21  don't.  So tell me why they don't, please.

22        MS. WILLENSON:  Your Honor, Mr. Betzen called Mr.

23  Barth to ask him if he would be a plaintiff in the case, and

24  whatever.  We'll find out what it is that he said when he

25  called him.  But Mr. Barth was not seeking out Mr. Betzen's

1    representation.  Anything in that conversation up to the point

2    where Mr. Barth sought representation is not privileged, Your

3    Honor.  It's critically important to whether there's been

4    collusion in this case.

5              THE COURT:  Well, we'll see about that.  Let's hear --

6    did you have anything that you want to say at this point?

7              MR. BETZEN:  Well, first of all, I want to clarify

8    that he was not contacted for purposes of seeking him to join

9    the case.  That's a point that I strongly disagree with.

10             THE COURT:  And maybe you should be the one to be

11   answering questions on that then.

12             MR. BETZEN:  I am more than willing to, yes.

13             THE COURT:  Ask him.

14             MS. WILLENSON:  Well, I would call Mr. Betzen as a

15   witness if the Court would allow it.

16             THE COURT:  I'll let you ask him some questions.

17             MS. WILLENSON:  Okay.  If the Court would allow, I'd

18   prefer to question Mr. Barth first and then question Mr.

19   Betzen.

20             THE COURT:  Well, you're making the allegation that he

21   made the call seeking him out.

22             MS. WILLENSON:  Correct.

23             THE COURT:  So ask him the question.

24             MS. WILLENSON:  Okay.  Did you want me to stand?

25             THE COURT:  You can -- however you're comfortable is

1  fine.

2            MS. WILLENSON:  Okay.

3            THE COURT:  What I'm going to do, though, Mr. Barth,

4  is ask you to step outside while this is on, but continue to

5  look in the window because we're going to possibly call you

6  right back here.  Okay.

7            THE WITNESS:  Okay.

8            THE COURT:  Thank you.  Just wait till he gets out.

9  Okay.  Go ahead.

10           MS. WILLENSON:  Did you want to call him?

11           THE COURT:  No.

12           MS. WILLENSON:  Okay.

13           THE COURT:  He's an officer of the Court.

14           MS. WILLENSON:  I understand that, Your Honor.

15  Absolutely.

16                      EXAMINATION

17  BY MS. WILLENSON:

18  Q.  Mr. Betzen, Mr. Barth didn't call you seeking

19  representation, is that right?  You called him?

20  A.  Yes, I initiated the initial contact with Mr. Barth.

21  Q.  Okay.  And he was on a list of names that the defense

22  lawyers gave you?

23  A.  Yes, he was -- the defense counsel provided a list of

24  potential witnesses who were also members of the putative

25  class.

1    Q.  All right.  You testified that --

2            THE COURT:  He testified?

3    BY MS. WILLENSON:

4    Q.  I'm sorry.  Yes, in your declaration --

5            THE COURT:  Okay.

6    BY MS. WILLENSON:

7    Q.  -- Mr. Betzen, you testified that Mr. Connor provided you

8    names and phone calls for seven individuals who had worked as

9    independent contractors for ACT, is that right?

10   A.  I can refer to that if Your Honor wants.

11           THE COURT:  Sure.

12           MR. BETZEN:  That's what I said in the declaration,

13   yes.

14   BY MS. WILLENSON:

15   Q.  Could you describe what was the lead up to that in the

16   conversation.  In your declaration you've testified about

17   certain statements that Mr. Connor made.  You haven't testified

18   at all about your own statements in the conversation.

19   A.  I'm not exactly sure I understand the question.

20           THE COURT:  I'm not sure I do either.

21   BY MS. WILLENSON:

22   Q.  All right.  Well, did you call Mr. Connor or did he call

23   you?

24   A.  The conversation you're referring to in paragraph 4 of my

25   declaration dated July 6th?

1    Q.   Correct.

2    A.   I believe he called me, but I don't know.  And I may have

3    returned a message.  I don't know.

4    Q.   And what did he say?

5    A.   He referenced the prior conversation that was discussed in

6    the declaration stating that they were going to provide a list

7    of potential witnesses.

8    Q.   And did he reference the fact that the defendants

9    anticipated that there would be objectors if you didn't add an

10   additional plaintiff to the case?

11   A.   No.

12   Q.   Did he reference that in the April 20th conversation -- I'm

13   sorry.  Was that referenced in your April 20th conversation

14   with Mr. Pearlman?

15   A.   You're referring to paragraph 3 of my declaration?

16   Q.   Correct.

17   A.   No, there was no mention in that discussion regarding

18   potential objectors.

19   Q.   Have you ever had any conversations with the defense

20   lawyers about the need to add a plaintiff in the case who could

21   assert the independent contractor claims?

22   A.   Not specifically the need to add a plaintiff.  There was a

23   dispute that arose regarding whether or not Mr. Butler could

24   represent the independent contractor claims in the present

25   case.  Plaintiffs have consistently contended from the

1    beginning based on the -- based on what Mr. Butler would be

2    willing to testify to that he is adequate to stand as a class

3    representative for the, for the full plaintiff class including

4    the independent contractors.

5    Q.  All right.  But to understand, you're not putting him

6    forward as a representative of the independent contractor

7    subclass, are you?  He's being put forward only as a

8    representative of the employee subclass?

9    A.  I don't think that distinction has been made specifically.

10   Q.  Well, which class is -- which subclass is he representing?

11   A.  It's my understanding that all three -- all three named

12   plaintiffs are representatives for the full class.  I don't

13   know that based on the resolution of the motion to clarify this

14   morning.  I don't know that he's currently going to be

15   considered part of the IC subclass, but that was based on

16   subsequent settlement negotiations between the parties.

17   Q.  Okay.  Turning again to this April 26th conversation.

18   Mr. Connor gave you a list of seven individuals and Mr. Barth

19   was on the list?

20   A.  Yes.

21   Q.  And the purpose of that was to -- in anticipation of the

22   settlement conference scheduled for April 29th, is that right?

23   A.  Are you reading from --

24   Q.  I'm looking at paragraph 4 of your declaration.  You said

25   the purpose of the conversation was to allow plaintiffs'

 1   counsel to contact individuals, et cetera, et cetera, in

 2   anticipation of the Court's supervised settlement conference

 3   scheduled for April 29th.

 4   A.   That is correct.

 5   Q.   And then you took the list and you called certain of the --

 6   one or more of the individuals on the list?

 7   A.   Yes.

 8   Q.   Was Mr. Barth the first individual that you called?

 9   A.   No.

10   Q.   And do you remember how many individuals you spoke to

11   before you called him?

12   A.   I think he was at least halfway down the list.  I think I

13   called four or five before I called him.  Whether I actually

14   spoke to all of them, I don't exactly recall.  I know I had

15   spoken to at least two or three others before I spoke with him.

16   Q.   And did you discuss with those individuals the possibility

17   of their becoming a class representative?

18   A.   That I believe is privileged.

19        THE COURT:  And that's as far as we're going to go,

20   and we're not going to call Mr. Barth.  So you can tell him he

21   can go back over there.

22        All right.  Now, I have a couple of questions that I

23   would like to ask of Miss Willenson.  Miss Willenson, you're

24   representing three individuals who are acting as objectors

25   here, is that correct?

```
 1          MS. WILLENSON:  No, Your Honor.  I'm representing 10

 2  individuals.

 3          THE COURT:  All right.  But you have -- well, tell me

 4  who those 10 individuals are.

 5          MS. WILLENSON:  Okay.  Ramiro Perez, Richard Ellis,

 6  Ari Tsironis I believe.  T-S-I-R-O-N-I-S.

 7          THE COURT:  One more time, please.

 8          MS. WILLENSON:  Ari, which is Argirios.  It's a Greek

 9  name.  I think it's A-R-G --

10          THE COURT:  Spell the last name.

11          MS. WILLENSON:  I think it's T-S-I-R-O-N-I-S.  I'd

12  have to pull a document out to be sure of that spelling, Your

13  Honor.

14          THE COURT:  That's close enough.

15          MS. WILLENSON:  George Callahan, Ted Koskinas or

16  Koskinas.

17          THE COURT:  Spell that one.

18          MS. WILLENSON:  K-O-S-K-I-N-A-S.  Greg Klemundt.

19  K-L-E-M --

20          THE COURT:  K rather C, okay.

21          MS. WILLENSON:  Pardon?

22          THE COURT:  K-L-E-M-E-N --

23          MS. WILLENSON:  U-N-D-T.

24          THE COURT:  Okay.

25          MS. WILLENSON:  Santiago Guzman, Anthony Jackson, Andy
```

```
 1   Cabin.
 2            THE COURT:  Spell that.
 3            MS. WILLENSON:  C-A-B-I-N.
 4            THE COURT:  Okay.  That's nine.
 5            MS. WILLENSON:  I'm thinking.
 6            THE COURT:  Okay.
 7            MR. PEARLMAN:  She may have been thinking Mr. Bonilla.
 8            MS. WILLENSON:  No.  No.  No.  There were 11 and now
 9   there are 10.
10            THE COURT:  Mr. Bonilla is no longer involved, right?
11            MS. WILLENSON:  Correct.
12            THE COURT:  Yet he's the named plaintiff in the other
13   case, is that correct?
14            MS. WILLENSON:  He was one of the two lead plaintiffs
15   in the other case, Your Honor.  It may be that he does not
16   proceed with those claims.  However, the case is on the
17   suspense docket.  So there's no opportunity to substitute him,
18   and I do not -- there's been no decision made --
19            THE COURT:  Okay.
20            MS. WILLENSON:  -- about whether he will proceed.  But
21   he's not proceeding in the objections.
22            THE COURT:  In any event, there's one more individual
23   for sure.
24            MS. WILLENSON:  Correct.
25            THE COURT:  How did you get these clients?
```

1           MS. WILLENSON:  They sought my representation, Your

2 Honor.

3           THE COURT:  You didn't contact them?

4           MS. WILLENSON:  No, Your Honor.  Each of these

5 individuals initiated contact with me.

6           THE COURT:  Did you --

7           MS. WILLENSON:  To the person.

8           THE COURT:  Who was the first one to contact you?

9           MS. WILLENSON:  Mr. Bonilla.  But of these then Mr.

10 Perez.

11          THE COURT:  Mr. Perez.  And do you speak Spanish

12 fluently I assume?

13          MS. WILLENSON:  Yes, I do, Your Honor.

14          THE COURT:  Okay.  And then Mr. Perez, how he did come

15 to you?

16          MS. WILLENSON:  Mr. Perez came to me with Mr. Bonilla.

17          THE COURT:  How did Mr. Bonilla come to you?

18          MS. WILLENSON:  That is privileged, Your Honor.  And I

19 don't want to waive it.

20          THE COURT:  Okay.

21          MS. WILLENSON:  I mean, he told me how he found me.

22          THE COURT:  All right.

23          MS. WILLENSON:  But he called me seeking legal

24 representation.

25          THE COURT:  Did all the others call you seeking legal

1    representation, or did he bring them to you?

2          MS. WILLENSON:  Mr. Perez came with Mr. Bonilla.

3          THE COURT:  The first time?

4          MS. WILLENSON:  To the initial meeting.

5          THE COURT:  Okay.  Anybody else?

6          MS. WILLENSON:  Mr. Ellis was the next one to contact

7    me, and I did meet with him in person after --

8          THE COURT:  And did you tell Mr. Perez or Mr. Bonilla

9    get me as many as you can?

10         MS. WILLENSON:  That would be privileged, Your Honor.

11         THE COURT:  Okay.

12         MS. WILLENSON:  And I can't waive it.  They're not

13   here --

14         THE COURT:  I'm not asking you to.

15         MS. WILLENSON:  They're not here to waive it.

16         THE COURT:  I'm just asking you questions.  All right.

17         MS. WILLENSON:  That, that --

18         THE COURT:  Let me ask you this:  If you have a

19   lawsuit with them --

20         MS. WILLENSON:  I can't answer the question, Your

21   Honor.  I wish I could answer the question.

22         THE COURT:  I haven't even asked it yet.

23         MS. WILLENSON:  Okay.  The previous question I wish I

24   could answer.

25         THE COURT:  I understand that.  I'm asking you another

1    question now.  What's the incentive agreement that you have

2    with each of these individuals should you reach a settlement or

3    should you win the lawsuit?

4              MS. WILLENSON:  Your Honor, I believe that that is

5    privileged.  If it weren't privileged, I would answer it.

6              THE COURT:  How is that privileged?

7              MS. WILLENSON:  Because it's the contents of my fee

8    agreement.  If the Court doesn't believe it's privileged, I'll

9    answer the question.

10             THE COURT:  No, I'll let you -- your objection

11   sustained to that.

12             MS. WILLENSON:  Well, I would prefer to answer the

13   question.  I'm just concerned I'd be --

14             THE COURT:  No, I don't want you to do it if you're

15   concerned.

16             MS. WILLENSON:  Okay.

17             THE COURT:  I don't want to try to force your hand to

18   something that you feel is privileged.  And that's fine.

19             Okay.  All right.  I don't have any other questions

20   regarding that now.  What I would like to hear is --

21             MS. WILLENSON:  Could I affirmatively offer more

22   information since the Court has --

23             THE COURT:  Regarding?

24             MS. WILLENSON:  My representation of these

25   individuals.

1         THE COURT:  No, I'm sure that that will come to light

2    if this matter doesn't get resolved.  And are they involved in

3    the Bonilla litigation?

4         MS. WILLENSON:  Mr. Jackson and Mr. Guzman are not

5    opt-in plaintiffs in the Bonilla litigation.

6         THE COURT:  Just the two.

7         MS. WILLENSON:  Because they're members of the

8    employee subclass.  They were not misclassified as independent

9    contractors.

10        THE COURT:  Okay.

11        MS. WILLENSON:  The other individuals have opted into

12   the Bonilla litigation.  It was filed as a putative collective

13   action.  We filed the collective action motion.  However, the

14   Court deferred ruling on the collective action motion because

15   of the motions to dismiss that were filed based on the pendency

16   of this case.  And now --

17        THE COURT:  And that's still pending, is that right?

18        MS. WILLENSON:  It's been placed on the suspense

19   docket.  We're to report back to the Court within 10 days of

20   this -- Your Honor's ruling on the preliminary approval motion.

21        THE COURT:  Okay.  All right.  And that's before

22   Judge --

23        MS. WILLENSON:  Manning.

24        THE COURT:  Judge Manning.  All right.  And are you

25   involved in that one also?

1    MS. WILLENSON: He's not actually. Mr. Pearlman --

2    THE COURT: It's an attorney from Comcast I guess who

3 represents Comcast.

4    MR. PEARLMAN: There is an attorney from Comcast,

5 although ACT has different --

6    MS. WILLENSON: Separate.

7    MR. PEARLMAN: Separate counsel. I am not counsel in

8 that case.

9    THE COURT: All right.

10    MS. WILLENSON: Could I have one thing, Your Honor,

11 that I believe is not privileged.

12    THE COURT: What do you want? You're asking me if you

13 can have one thing. What do you want?

14    MS. WILLENSON: No, add one thing.

15    THE COURT: Oh, add one thing.

16    MS. WILLENSON: I'm sorry. My allergies are really

17 bad. I'm not articulating. The only agreement I have -- the

18 agreement that I have with these individuals for

19 representation, for funds they would recover in this

20 proceeding --

21    THE COURT: Yes.

22    MS. WILLENSON: -- is fee shifting only.

23    THE COURT: Okay.

24    MS. WILLENSON: Whatever the Court might award to my

25 law firm for our efforts, and that's it.

```
 1            THE COURT:  Okay.  Thank you very much.  Now, what I'd
 2   like to ask is plaintiffs' counsel, defense counsel regarding
 3   the clawback, if you will.  In other words, what funds are left
 4   over is supposed to go to ACT?
 5            MR. PEARLMAN:  That is correct, Your Honor.  The
 6   mechanism that's used for this settlement procedure under Rule
 7   23 is a claims-made process.  If there is any claim that is not
 8   claimed, the company would retain those funds under the
 9   structure.
10            THE COURT:  And why is that?  Because you're a great
11   negotiator?  Is that what you got them to agree to?  Is that
12   what it was?
13            MR. PEARLMAN:  Your Honor, the rationale behind that
14   clause is simply that a pot of money is set aside for the
15   settlement with the understanding that it can be fully
16   exhausted.  So ACT bears the risk of all of that money being
17   taken.  And if not all of that money is taken, then ACT keeps
18   its money.
19            THE COURT:  Why not a cy pres?
20            MR. PEARLMAN:  Your Honor --
21            THE COURT:  At least for a portion of it.
22            MR. PEARLMAN:  Sure.  You know, the rationale behind
23   not using a cy pres was simply that this is money that ACT, a
24   company that is not profitable and that is now being killed
25   with, you know, attorneys' fees in two different cases, is, you
```

1    know, under the gun.  It set aside a --

2            THE COURT:  What's the second case?  Is that --

3            MR. PEARLMAN:  The Bonilla.

4            THE COURT:  Bonilla.

5            MR. PEARLMAN:  Bonilla litigation.

6            THE COURT:  But are you as involved in that one as you

7    are in this one?

8            MR. PEARLMAN:  Not at all.  I don't represent the

9    company --

10           THE COURT:  Not you, but whoever represents -- who

11   represents them?  Somebody from your firm?

12           MR. PEARLMAN:  No, Your Honor.

13           THE COURT:  Oh, so entirely different.

14           MR. PEARLMAN:  A different firm.  Ogletree Deakins.

15           THE COURT:  Well, how are you involved in that one

16   then?

17           MR. PEARLMAN:  I have talked with my client about the

18   status of that case, and I've listened to my client's constant

19   concerns that fighting litigation on two different fronts is

20   overwhelmingly expensive for a company that's not profitable.

21           THE COURT:  Okay.  Let's go back, though, to what we

22   were talking about.

23           MR. PEARLMAN:  Sure.  As far as cy pres is concerned,

24   our view was that the goal is to make sure that everybody who

25   is a putative settlement class member has an opportunity to get

1   a full claim from the settlement fund.  And so if that happens,

2   then all the money is exhausted.

3          THE COURT:  And then some probably.

4          MR. PEARLMAN:  Right.  And so if it's -- you know, if

5   it doesn't happen and if there's any residue, that would remain

6   the company's, the company's money.  However, quite candidly,

7   this is not a sticking point for us.

8          THE COURT:  So that's negotiable?

9          MR. PEARLMAN:  Ultimately if it came down to a

10  question -- and I'd need to discuss this with my client a

11  little bit further.  And while we think that the residue would

12  not be sizable, it's not a sticking point for us.

13         THE COURT:  I can't imagine it being sizable to be

14  honest with you, but that's sheer speculation on my part.  I

15  mean, you really don't have a horse in that race, do you?

16         MR. BETZEN:  There's -- I would agree with the first

17  thing Your Honor said that he's just a great negotiator and

18  that's why it was resolved that way.

19         THE COURT:  I said that tongue in cheek, just so the

20  record reflects that.

21         MR. PEARLMAN:  Duly noted.

22         MR. BETZEN:  I like that tongue in cheek nature.  But

23  in all honesty it was -- it came about as a point of

24  negotiations as a way to resolve the settlement.  In addition,

25  one of the aspects of this case that made that agreeable from

 1    my perspective was this -- in my experience there is a very

 2    high level of turnover in this class.  And there are a large

 3    number of class members who --

 4            THE COURT:  It's not that big a class to be honest

 5    with you.

 6            MR. BETZEN:  No, it's not.  But given the fact that

 7    they only have about 50 employees at a time and there's 400

 8    people in a little over two years, that's a pretty high rate of

 9    turnover.  I felt that that made the claims-made procedures --

10    a number of people were going to have very small claims.  It

11    would maximize the defendants' ability to fund the settlement

12    and maximize the claims of the more motivated plaintiff, class

13    members, while some of them may have smaller claims and be less

14    concerned.

15            THE COURT:  Hang on one second.  I'm looking for

16    something.

17        (Brief pause.)

18            THE COURT:  Miss Willenson, that TechNet data you

19    indicated that you thought that we had it?

20            MS. WILLENSON:  The limited data for the three

21    individuals.

22            THE COURT:  Just for them.

23            MS. WILLENSON:  Correct.  That's all we have, Your

24    Honor.

25            THE COURT:  Okay.  All right.  And then what I'd like

1   to know from you is what your feeling is about the potential

2   risk of continued litigation in your analysis of the value of

3   the proposed settlement.

4           MS. WILLENSON:  Your Honor, that's very difficult to

5   say since --

6           THE COURT:  It is, but it's something we have to deal

7   with.

8           MS. WILLENSON:  Well, I understand.  If I could -- I

9   can respond to a few points that have been made.  I don't see a

10   high risk whatsoever of not prevailing on a class certification

11   motion.  It's Hornbook law that differentials in damages in an

12   unpaid wage case do not undermine the propriety of class

13   certification under Rule 23.  Hornbook law.  So I see very

14   little risk on class certification to me.  And based on my

15   experience in getting certification in similar cases, this is a

16   case where the class is highly likely to be certified.

17           As far as the merits of the claims, Your Honor, I

18   think there's a -- there's likely to be quite a distinction in

19   the merits of the claims for the independent contractor class

20   and the subclass and the employee subclass.  I think the

21   arguments for the independent contractor subclass is

22   extraordinarily strong.  That's my assessment based on many

23   facts that I have at my disposal, based on a review of the case

24   law.  I don't know how much exposition, Your Honor.  Probably

25   not extensive exposition.

1          THE COURT:  That's enough.  You want to get Mr.

2     Crandall, please.

3          MS. WILLENSON:  I believe, I believe -- Your Honor, I

4     would not have filed, you know, the Bonilla litigation, which

5     will be the Perez litigation without having a very high opinion

6     of the merits of the case, Your Honor.

7          THE COURT:  I understand that.

8          MS. WILLENSON:  I'm a small law firm.  I follow with

9     that grand analysis that is called the one case at a time

10    strategy.  I don't take on multiple large cases.  I have a very

11    high opinion of the merits of the claims for the independent

12    contractors --

13         THE COURT:  Okay.

14         MS. WILLENSON:  -- subclass.  I am both less familiar

15    with the claims of the employee subclass and also have much

16    less information at my disposal because I've only interviewed

17    two individuals.  So I think there might be some additional

18    risk in pursuing those claims.

19         THE COURT:  Who are the two individuals?

20         MS. WILLENSON:  Santiago Guzman and Anthony Jackson.

21         THE COURT:  Okay.

22         MS. WILLENSON:  Those are the two objectors who

23    have --

24         THE COURT:  Okay.  I can't let you take up all the

25    time here.  I want to hear from Mr. Pearlman, and then we're

1    going to have Mr. Crandall.

2            MR. PEARLMAN:  Sure.

3            THE COURT:  Okay.

4            MR. PEARLMAN:  And, Your Honor, I have prepared a

5    direct examination for Mr. Crandall.

6            THE COURT:  And that's the way I'd like to proceed.

7    And then if I have any questions after you have concluded with

8    any questions that any of you have, you would go next, though,

9    after Mr. Pearlman.

10           MR. BETZEN:  I appreciate that.

11           THE COURT:  And then we'll call you last if you have

12   any questions of him, and then I would be the last one.

13           MR. PEARLMAN:  Your Honor, I have just a couple of

14   statements that I do need to make a record of in response to

15   Miss Willenson's statement that class certification in her view

16   is unlikely because our arguments are limited to differentials

17   in damages.

18           THE COURT:  Sir, if you'll come up here, please.  Go

19   ahead.

20           MR. PEARLMAN:  Miss Willenson's argument respectfully

21   does not in any way come close to accurately characterizing our

22   opposition to class certification.  Talk about Hornbook law,

23   the law is quite clear that Courts routinely refuse to certify

24   off the clock work claims because of the fact intensive and

25   inherently individualized analysis that it presents.  Moreover,

1  Miss Willenson has told the Court I think two times now she

2  hasn't seen the data.  She hasn't seen any class wide data.  So

3  for her to make the statement that she believes that it's

4  highly likely that class certification would not be granted has

5  zero foundation or value.

6        THE COURT:  It's her argument.  She has the right to

7  make that argument.  I understand that.

8        MR. PEARLMAN:  Very well, Your Honor.  Moreover, I

9  think it's important to understand, as we'll establish through

10  Mr. Crandall, that the evidence that's at issue here is not

11  representative -- it shows that this is not a case where you

12  can use representative evidence to understand the experience of

13  a class wide -- of the class in this instance.  I think at this

14  point it may make sense for me to begin --

15        THE COURT:  I think it does too, but let me ask.  How

16  long do you want for lunch assuming we need to take one?

17        MR. PEARLMAN:  We're easy.  Whatever works for the

18  Court.

19        THE COURT:  If anybody wants to stand up or use the

20  restroom now is the time to do it.

21     (Short break taken.)

22        MR. BETZEN:  We just want to confirm real quick, Your

23  Honor, that you stated at the break I believe that you no

24  longer need the plaintiffs here.

25        THE COURT:  That's correct.

1        MR. BETZEN:  All right.  We were sending them out.

2        THE COURT:  Good.  Good.  And you need to stand up,

3   and I need to give you the oath here.

4        ROBERT CRANDALL, DEFENDANTS' WITNESS, DULY SWORN

5                       DIRECT EXAMINATION

6   BY MR. PEARLMAN:

7   Q.  Good morning, sir.  Would you please state your name for

8   the record.

9   A.  Robert W. Crandall, C-R-A-N-D-A-L-L.

10  Q.  Now, Mr. Crandall, I'm going to be asking you some

11  questions, and your obligation here is to testify truthfully,

12  completely, and honestly.  Do you understand that?

13  A.  Yes, I do.

14  Q.  Mr. Crandall, what's your current position and employer?

15  A.  I am a partner in a firm called Resolution Economics.

16  Q.  And what does Resolution Economics do?

17  A.  Generally we specialize in analyzing class action claims of

18  employment discrimination and class action wage and hour

19  claims.

20  Q.  Tell me a little bit about your work history.

21  A.  I started in litigation consulting at Price Waterhouse in

22  the dispute analysis and corporate recovery group.  My partner

23  and I left to go to a firm called Altschuler, Melvoin and

24  Glasser to found the economics and litigation services group

25  there in Los Angeles.  That practice was bought by Deloitte &

 1    Touche.  And shortly thereafter my partner and I founded

 2    Resolution Economics.

 3    Q.  And tell us, Mr. Crandall, what's your educational

 4    background.

 5    A.  I have a BA in history from USC and I have a masters in

 6    business administration from Loyola Marymount University.

 7    Q.  Have you ever been qualified as an expert in federal or

 8    state court?

 9    A.  Yes.

10    Q.  Have you been qualified an expert in both?

11    A.  I've been qualified as an expert in both.

12    Q.  Have you ever been called upon to present expert analysis

13    in connection with mediations?

14    A.  On more than a hundred instances.

15    Q.  Have you ever served as a mediator or a neutral yourself?

16    A.  I have been retained in connection as a neutral for both

17    sides.  I wasn't the mediator.  The mediator used me to support

18    him.

19    Q.  Are you familiar with class action wage and hour cases?

20    A.  I've done more than 300 of them.

21    Q.  Let's talk for a moment about the type of methodology that

22    you use to approach these types of cases.  Is there a

23    particular type of scientific method that you use in order to

24    collect representative data in wage and hour transactions?

25    A.  Well, it depends on the issue, but generally we use a

1    variety of approaches.  Surveys scientifically designed, time

2    and motion studies, and forensic data studies, similar to what

3    we've done here today.

4    Q.  Why is looking for a class wide average experience of

5    workers in these types of cases important in your experience?

6    A.  Well, generally from a statistical perspective what a class

7    action means is we can draw a group of people from this class,

8    do some kind of detailed analysis, and from there make

9    extrapolations back to the remainder of the class members who

10   were not part of our sample without significant error.

11   Q.  Now, what's the difference between average and median

12   statistics?

13   A.  Well, they're both measures of the central tendency of a

14   population.  So in this case a population's a class action.

15   The average is the arithmetic average.  Essentially it's the

16   total values for everybody divided by the numbers.  Whereas,

17   the median is the middle person record.  If you were to line

18   everybody up and cut the line at the middle, that's the median

19   record.  The difference between the two is the average can be

20   influenced by outliers, whereas the median cannot.

21   Q.  Then how do you determine when to use an average versus

22   when to use the median?

23   A.  Well, part of it is judgmental, but you definitely need to

24   understand about the size of your population.  To the extent

25   that you're studying a small number of people, in your sample

Crandall - direct by Pearlman                                      82

1    outliers have a much bigger impact.  And in many instances in

2    larger populations the average and the median are very similar

3    to each other.

4    Q.  In these over 300 mediation -- 300 wage and hour class

5    actions involving, you know, large groups of folks suing

6    together, what sort of issues do you focus on in the class

7    certification context from the perspective of a statistician?

8    A.  Essentially you assess the level of variability across

9    class members when you look at representative data.

10   Q.  Why?  Why does variation and experiences among the class

11   matter from a statistical perspective?

12   A.  Well, for two reasons.  One, we look at how well the

13   average statistic represents the experience and class.  I can

14   give you two examples to illustrate the point.

15          Suppose we had a class where half the people worked 10

16   hours a week or zero.  Let's just say they didn't work at all.

17   And half the class worked a hundred hours a week.  In that case

18   the average is 50 hours, but that actually doesn't represent

19   anyone's experience.  And if you were to apply that average to

20   the group, you'd be paying people who had no overtime 50 hours.

21   You'd be paying people that had quite a bit of overtime 50

22   hours, half of what they're entitled to.

23          Now, conversely, suppose we had a situation where half

24   the people worked 40 hours a week and half the people worked

25   42.  Well, the average there is 41.  In which case the average

1   is very representative of the population.

2   Q.  Did you have an assignment with respect to this particular

3   case?

4   A.  Yes.  I was to go in to collect representative evidence

5   relating to hours worked and study the other available data.

6   Q.  Okay.  And tell us, Mr. Crandall, what did you do in order

7   to carry out that assignment.

8   A.  I devised a random sampling protocol to select workweeks

9   where I then pulled the work orders on an individual basis.

10  And from that I actually analyzed the work orders to

11  reconstruct the employee's day or the contractor's day

12  depending on the time period, and examined the total hours

13  worked per week, the total days worked per week.

14  Q.  For how many workweeks did you undertake this task of

15  analyzing the work orders?

16  A.  In total we had 186 workweeks in our sample.

17  Q.  Let's talk about the other types of data that you looked

18  at, Mr. Crandall, in formulating your opinions in this case.

19          Did you look at any time keeping or time punch data?

20  A.  Yes, I did.  I looked at time keeping data from the

21  employee period in 2009.

22  Q.  Can you approximate the number of class members for which

23  you looked at that data?

24  A.  My recollection is it's somewhere near 200, but -- and it's

25  got essentially 966 workweeks in that data.

1  Q.  Also, Mr. Crandall, did you take a look at any payroll

2  and/or expense data?

3  A.  I looked at both.  The payroll data was from the employee

4  period.  It was actually the base file for my statistical

5  sampling of workweeks.  If you got paid, you were in the

6  sample.  We assumed that you worked that week.  On the other

7  side during the independent contractor period, they have what's

8  essentially called a debit and credit file since they were paid

9  as independent contractors.  And from there you could see week

10 to week payments and deductions.

11 Q.  Why?  Why did you look at this data?

12 A.  That would indicate to me who was active during a

13 particular week.

14 Q.  Why did you look at work orders?

15 A.  Well, work orders from my perspective is one of the best

16 methodologies to examine at least the in-service time.  In

17 other words, how much time are they doing productive work

18 relative to their primary position of installing or

19 disconnecting cable.

20 Q.  Why did you look at time punch data?

21 A.  I like to see the time punch data because it might give me

22 some information about other time that potentially is

23 compensable.

24 Q.  Now, Mr. Crandall, when you were looking at the different

25 forms of data that you just described to the Court, did you

1    look for any variations in the amount of -- in the experiences

2    of the class population?

3    A.   Well, with the declarations I had filed with the Court I

4    included some charts which showed enormous variability across

5    the workweeks in terms of the hours of in-service time.   That

6    variability was also corroborated when you looked at the data

7    for the three plaintiffs that Miss Willenson represented as

8    well.

9    Q.   Well, when analyzing that data and looking at the sort of

10   variability among folks that you're discussing here, did you

11   reach any conclusions as to whether or not work was spread out

12   evenly across the class population?

13   A.   It was clear to me that the data suggests there was a

14   certain core group of individuals who were working and then you

15   had another large group of people who were doing more fill in

16   work.

17   Q.   Now, how did you reach this conclusion?   Could you explain

18   that to the Court.

19   A.   Well, you can see it two different ways.   The most obvious

20   is during the independent contractor period, you can look at

21   earnings.   Since they were paid on a piece rate basis, people

22   with high earnings obviously had more assignments than people

23   with low earnings.

24   Q.   Now, did you reach any conclusions with respect to the

25   employee subclass as well?   You've talked about the independent

1    contractor subclass.

2    A.  Well, the employee subclass also shows a pattern of wide

3    variability, which suggests that the demand for installation

4    and disconnect services varied on a week to week basis and

5    probably seasonally as well.

6    Q.  Now, you do work in different states, right?  You serve as

7    an expert in California, you serve as an expert out on the East

8    Coast, and you also are serving as an expert here in Illinois;

9    right?

10   A.  That's correct.

11   Q.  In Illinois did you have an understanding, and I'm not

12   asking you to opine on what the law is, just whether or not

13   there's a daily overtime rule or a weekly overtime rule?

14   A.  My understanding is that Illinois is like the FSLA, and

15   it's the weekly overtime rule.

16   Q.  So what does that mean?

17   A.  Hours in excess of 40 become overtime.  As opposed to hours

18   in excess of eight hours a day under a daily rule.

19   Q.  Did you have occasion to analyze whether or not folks who

20   comprise the class were working throughout the workweek for --

21   the workweek, for five days throughout the workweek or for less

22   than five days?

23   A.  Well, from the work orders sampled, the average number of

24   days worked per week of the 186 randomly selected weeks was

25   4.8.

1   Q.   Okay.

2   A.   So it was less than five.

3   Q.   What from a statistical perspective is the implication of

4   that with respect to overtime claims?  And let me put that into

5   much plainer English.  How does this impact overtime claims in

6   your opinion?

7   A.   Well, if you -- based on my understanding of the various

8   arguments between the parties, plaintiffs are claiming

9   additional time worked at the beginning and preimposed shift,

10  so to speak.  Outside of the actual productive work window,

11  which I'm labeling in-service time.  So to the extent that that

12  exists, the number of days when that happens is germane to that

13  question of how many overtime hours are worked.

14  Q.   So if it's less than five days that folks across the class

15  are working, would that mean -- does that impact your opinion

16  of whether or not they'd be working hours over 40?

17  A.   Most likely the fewer the days that you work per week,

18  mathematically it works out to less likely you're going to be

19  working overtime.

20  Q.   Now, you explained to the Court a moment ago that there was

21  variation among the amount of work distributed among the class

22  based on your analysis of data.  Am I understanding that

23  correctly?

24  A.   Yes.

25  Q.   With that premise did you form an opinion as to whether the

1   data that you looked at indicated whether or not there's any

2   resulting variations among the putative settlement class?

3   A.   You see variation across everyone.  And the way they

4   handled that was we had a situation where we distributed the

5   funds based on those who were most likely to have worked

6   overtime.

7   Q.   Now, you opined earlier -- excuse me.  Let me strike that.

8            You discussed earlier the role that you have taken in

9   looking at whether class certification is appropriate, correct?

10  A.   That's correct.

11  Q.   And I believe you mentioned one of the things you focus on

12  is whether or not the testimony of a few or the experiences of

13  a few can be representative of the experiences of the folks

14  that they purport to represent, the broader class.  Is that

15  fair?

16  A.   Exactly.  We're looking at a sample, we do detailed

17  studies, and then we do extrapolations from that sample.

18  Q.   And you look at this in the context of whether class

19  certification is appropriate.  That's how you often get

20  assigned?

21  A.   I certainly offer statistical opinions related to the

22  issues in the class.

23  Q.   Did you, Mr. Crandall, based on your analysis of the data

24  form an opinion as to whether or not in this case

25  representative testimony may be used to determine the number of

1   overtime hours worked among the class?

2   A.   I think that representative testimony is going to have

3   several issues.  First my analysis of the work order data and

4   also the payroll data from the employee period shows a

5   substantial number of the weeks are going to be below 40.

6   Potentially there are going to be class members who never

7   worked any overtime at all.  And suppose we went through this

8   process, we selected a random sample, we did the detailed study

9   on those people in our sample, and we found that 30 or 40

10  percent of the people in our group over worked overtime.  In

11  other words, there's no FSLA merits issue.

12          At that point then what we do?  We can estimate

13  roughly that that same proportion outside of our sample has --

14  there's going to be another 40 percent or so, whatever, who

15  never worked overtime.  However, we can't tell you who without

16  doing the detailed individualized inquiry.  So at that point we

17  have an issue in terms of identifying who's going to be a

18  merits claim and who's not.

19  Q.   What does that mean in plainer English, who's going to be a

20  merits claim and who's not?

21  A.   Well, you've got -- essentially if you think about what a

22  verdict is going to be, I mean, how do you try the case if you

23  have -- what if half the people have merits claims and half

24  don't?  What's the class decision on that?  If everybody's the

25  same, suppose everybody worked overtime, then it becomes more

1    of a damages issue in figuring that out.  But if you have to

2    figure out the merits, then if we decide for the plaintiffs and

3    it's 50/50 suppose, and suppose the case were decided for

4    plaintiffs, that means that half the people who were not

5    entitled to claim get paid.

6              On the other hand, if it goes against the plaintiffs,

7    then you're taking away the claims of people who have valid

8    claims in a large number.  So it really comes down to how much

9    error the Court's willing to tolerate in a class wide

10   adjudication.

11   Q.  Otherwise what does the Court need to do to delve deeper

12   into the claims to figure out whether or not somebody has

13   overtime?

14   A.  Well, you'd have to look at it individually.

15   Q.  Now, Mr. Crandall, do you recall that you prepared two

16   separate declarations in this case?

17   A.  Yes, I do.

18   Q.  Let's talk about your first declaration and your second

19   declaration as well.  I believe you at the beginning of your

20   testimony here today like in your declarations used the term

21   in-service time.  Could you please explain to the Court what

22   that means in the context of your analysis.

23   A.  Well, in-service time if you want to, you know, to throw a

24   legal term out there is the same as productive time.

25   Essentially it's the time that the installer or disconnector is

Crandall - direct by Pearlman                    91

1   spending doing their actual primary job of installations or

2   disconnects.  And the way I've defined it is from the moment

3   they arrive at their first stop of the day to the moment they

4   depart from their last stop in the evening.  So that gives us

5   an estimate of productive time.  Then we're asking questions

6   about how much time potentially is outside of that productive

7   time window that may be compensable.

8   Q.  And in plainer English when you're talking about the

9   productive time, we have cable installers and cable

10  disconnectors.  So what do you mean?

11  A.  I mean the time they're actually at the customers doing the

12  work, the installation or the disconnect work and they're

13  driving between customers.

14  Q.  So how was this in-service time factored into your

15  analysis?

16  A.  Well, for one it's a proxy of what we'd expect to have in

17  terms of total hours.  If you, for example -- I'll take

18  Mr. Bonilla.  He had I think 15 hours every week of in-service

19  time.

20         THE COURT:  You mean Bonilla?

21         THE WITNESS:  Mr. Bonilla, pardon me.  Mr. Bonilla.  I

22  should have pronounced that better.  I live in Los Angeles.

23  Mr. Bonilla had 15 hours of in-service time a week on average.

24  Well, to get to overtime, you need 25 hours.  So the question

25  then is what's the likelihood that he worked significant

1    overtime given that average.

2    BY MR. PEARLMAN:

3    Q.   And, Mr. Crandall, when you analyzed the work orders for

4    the 186 weeks, did you reach any findings and formulate an

5    opinion with respect to the amount of in-service time worked

6    among the class?

7    A.   Well, generally installers worked a little less in-service

8    time on average than disconnect folks.  And the range was about

9    24 to 31 hours a week.

10   Q.   Did that inform your opinion or conclusion as to

11   plaintiffs' claims -- as to plaintiffs' claims and the

12   potential objectors' claims that they were owed significant

13   overtime?

14   A.   Well, the objectors, I mean, are some of the people that

15   actually had the most hours in the group.  So, you know,

16   they're a little different than the group's average.  They're

17   not really typical of the overall experience of the class.  So,

18   you know, in terms of we're trying to characterize the group of

19   several hundred people as opposed to two or three individuals,

20   we have to look at the averages.  And that's where I -- my

21   analysis relied on.

22   Q.   Okay.  Now, the potential objectors claim that in their

23   view your methodology of analyzing in-service time is flawed

24   because it does not include compensable time spent by

25   technicians before they arrived at their first job site during

1    the day, and for technicians like Mr. Perez time spent each day

2    at home completing work orders that they were required to turn

3    in the next morning.

4            Do you have a reaction to this critique?

5    A.  Well, for one we did account for that time certainly at the

6    beginning of the day when we looked at the time keeping

7    analysis.  If you look at the second -- at one of the charts in

8    my declarations I do a comparison of the average in-service

9    time and also the average time keeping time for both --

10   actually all three of Miss Willenson's clients.  So we

11   definitely examined that.  And we actually looked at the

12   difference --

13   Q.  To your knowledge.  So let's focus on -- take Mr. Bonilla.

14   A.  Okay.  Okay.  Well, then the two clients that remain.  In

15   taking those two clients that remain, if you look at the

16   differences between their average TechNet data, which is the

17   Comcast work order data, and their average time keeping data,

18   it's about seven and a half hours a week.  Seven to seven and a

19   half.  So that would account for that morning time when they

20   clock in till they clock out at night.

21   Q.  Now, Mr. Crandall, again, what was your conclusion as to

22   the overall class experience with respect to work to in-service

23   time?  In more plain English how many hours did you conclude on

24   average they worked based on your data?

25   A.  Generally -- well, it depends on what your categories are.

1    We broke it out in four different ways, install contractor

2    install employee, disconnect contractor, disconnect employee.

3    And the installers had in-service time roughly between 24, 28

4    hours a week.  Then the disco guys were actually very close.  I

5    want to say 30.8 and 31 if my memory serves correctly.

6    Q.  Now, do you recall, Mr. Crandall, that the potential

7    objectors had a much different view than you of what the class

8    wide average of overtime was?

9    A.  Well, the potential objectors didn't really construct an

10   average.  That's one of the flaws of what they've done.

11   They've essentially taken one person who happened to have the

12   highest hours in both TechNet and in the employee time punch

13   period, added a bunch more hours on to that, and then said that

14   that's representative of the group.  And that's just not an

15   average.  That's not a sample.

16   Q.  Well, what was the average that they claimed existed for

17   the number of hours that were worked per week?

18   A.  Miss Willenson's declarations claimed that the average

19   hours worked per week was 66.

20   Q.  Were you able to analyze -- so 66.

21   A.  That's correct.

22   Q.  Were you able to analyze -- were you able to break that

23   down to determine from her declaration how she believed that

24   time was allotted?

25   A.  My recollection is I think she put 16 or 18 hours to time

 1  between arrival at the morning and first stop.  I think that

 2  she then added, and this is my recollection, 6 hours a week in

 3  paperwork I think.

 4          MS. WILLENSON:  Your Honor, his answer -- I mean, I

 5  would object to the questions about what's in my declaration

 6  unless he has it in front of him.

 7          MR. PEARLMAN:  How about we make it easier.

 8          THE COURT:  Just give it to him.

 9          MR. PEARLMAN:  How about we put it in front of him.

10  May I approach, Your Honor.

11          THE COURT:  Sure.

12  BY MR. PEARLMAN:

13  Q.  Handing you Miss Willenson's declaration.  Could you turn

14  to paragraph 5, please.  This isn't the first time you're

15  looking at this, correct?

16  A.  No, it is not.

17  Q.  In fact, you prepared a supplemental declaration after this

18  was submitted, correct?

19  A.  That's correct.

20  Q.  Does your supplemental declaration -- did you vet the

21  statements and issues raised in Miss Willenson's declaration?

22  A.  I certainly comment upon them and how they're not

23  appropriate measures of the class wide experience.

24  Q.  Well, first let's understand what --

25          THE COURT:  How much longer are you going to be?

1          MR. PEARLMAN:  About 10 or 15 minutes.  Is that

2   possible?

3          THE COURT:  Okay.  And then we'll break, and you'll

4   get a chance to cross him.

5          MS. WILLENSON:  I have very few questions, Your Honor.

6   So it may make sense to -- very few.

7          THE COURT:  Well, and I'd like to go forward.  But it

8   all depends upon you.

9          MS. WILLENSON:  I have very few questions for this

10  witness.

11         THE COURT:  Well, let's try.

12         MR. PEARLMAN:  I'll do my best to go quickly.

13         THE COURT:  But, you know, she has a job that she has

14  to appear at with Judge Coleman at 1:30, and she also needs a

15  little opportunity to get something to eat.  So I'm not trying

16  to stifle either one of you.  If you want to do it before

17  1:00 o'clock, that's fine.  If not, we're going to break and

18  we'll come back at 1:30.

19         MR. PEARLMAN:  All right.

20         THE COURT:  With a different court reporter.

21         MR. PEARLMAN:  We appreciate your help very much.

22         MR. BETZEN:  Can I confirm real quick what document

23  number you're looking at?

24         MR. PEARLMAN:  Sure.  I'm looking at document 89-2,

25  page 2.

Crandall - direct by Pearlman                          97

1              THE COURT:  And paragraph 5, right?

2              MR. PEARLMAN:  Yes, Your Honor.

3    BY MR. PEARLMAN:

4    Q.  Mr. Crandall, do you see a reference to 66 hours total?

5    A.  That's correct, yes.

6    Q.  Was that your understanding of what Miss Willenson believed

7    the class wide average is?

8    A.  That's what it appears that she's represented the class

9    wide average.  Certainly she's tried to base her calculations

10   of potential economic exposure upon that number.

11   Q.  Now, it says in the second sentence, it assumes that he, in

12   reference to Mr. Perez, worked an average of 26 hours of

13   overtime per week.

14   A.  That's what it says, yes.

15   Q.  Now, did you form any opinion based on her declaration and

16   the data that you looked at as to the amount of time that cable

17   technicians would need to spend on in-service duties as you've

18   defined them versus the amount of time that they'd need to

19   spend on nonin-service duties such as filling out paper?

20   A.  Well, if you take, if you just take what she's claimed, 66

21   hours per week, and then you look at the actual data for Mr.

22   Perez, the Comcast data that she purportedly relied upon

23   produced an average amount of in-service time of 37.45 hours

24   per week.  So clearly we've got a huge difference, you know, 29

25   hours between the in-service time and the purported overtime

Crandall - direct by Pearlman                98

1    hours that Miss Willenson claims.

2         Then you look at the time keeping data it's about --

3    it's 44.92 hours per week.  And remember the time keeping data

4    is going to account for that time at the beginning of the day

5    when they clock in before they're first in service.  So that's

6    accounting for that time period that she's throwing a lot of

7    weight towards.  So his average is 44.92.  So again, we are

8    significantly short.  That's 22 hours of difference.  And if

9    we're accounting for the early morning time, it just doesn't

10   make sense to have 22 hours of paperwork.  From my perspective,

11   I've looked at the documents, I just don't think that that

12   makes sense.

13   Q.   Are you a labor economist?

14   A.   I am a labor economist, but I also do a lot of time and

15   motion studies and work force productivity studies.  I've done

16   several cases where that's been the focus of my inquiry.  I

17   also do time work surveys.  And if you look at the documents

18   that are there, there's two things that struck me from a

19   process perspective.  One is that some of the documents I think

20   you can probably fill out contemporaneously.  For example, the

21   box drop off.  If you dropped off at a stop spot.  Two, they're

22   filling out maybe 15 or 20 items on a sheet.  And at the end of

23   the day if that's the case, that does not appear to be a

24   multiple hour adventure.

25   Q.   Did you in that vein take any look -- take a look from the

1   data at whether or not there was any down time experienced by

2   the class members?  Do you understand what I mean when I use

3   the term down time?

4   A.  Well, that's called time that's unassigned.  And you might

5   have a situation where you have an appointment window, for

6   example, maybe it's 8 to 10 or whatever the number could be,

7   and you finished your appointment early and you've got a two-

8   or three-hour gap between that and the next appointment, for

9   example.  Now, in-service time based on my estimation is going

10  to capture that gap and count it as compensable time.

11          But to the extent that the employee may have taken a

12  break when they know they don't -- their next appointment is

13  not until 2 and it's 11 o'clock, well, that break time is not

14  accounted for in my analysis.  And it also would not be

15  accounted for in the time keeping analysis from the employee

16  period.

17  Q.  Based on the data that you read, do you have questions --

18  that you have reviewed and analyzed, do you have questions as

19  to whether or not the amount of down time that 400 different

20  folks who comprise the class varied amongst one another?

21  A.  Well, it certainly varied in the sample that we observed

22  across the 186 workweeks.  So given that our sample is randomly

23  selected and representative, I would imagine that it's also

24  going to occur outside of our sample.

25  Q.  And if you needed more information with respect to what

1    specific technicians did during their -- what their experiences

2    were with respect to this unassigned time or down time, what

3    would you need to do?

4    A.   You'd have to repeat the process we did with the sample and

5    individually reconstruct people's work.

6    Q.   Now, when you analyzed total compensable hours, just to be

7    clear, did you also include work time before the first job and

8    after the last job?

9    A.   The analysis of the time keeping data would include that,

10   yes.

11   Q.   Now, did you reach any findings based on the time keeping

12   data as to whether or not the class members worked an

13   appreciable amount of overtime?

14   A.   Well, the average for all of the time period in the

15   employee period was 34 hours a week.  And that's accounting for

16   this, let's call it pre-productive time between the time they

17   clock in and go to their first assignment.  So even if you were

18   to tack on some time for paperwork, you're probably -- on

19   average you're not going to get to 40.

20   Q.   Now, let's look in contrast at the potential objectors'

21   estimate.  First of all, did you have any questions as to the

22   level of scientific rigor or expertise that was applied when

23   conducting their analysis?

24   A.   Well, from my perspective the term -- she took the highest

25   hours person in her data.  She only used him.  Had she used

1   Mr. Bonilla, or Bonilla, it would have obviously dramatically

2   reduced the average.  So she decided to ignore people that had

3   findings that were different.  Then when she went to look at

4   the economic damages, payroll for the entire period, yet she

5   selected it based I think on 9 weeks.  Mr. Perez worked from

6   '07 through 2000 -- I think 2010.

7   Q.  How many of those weeks do you know were included within

8   the class period?

9   A.  In 2008 it's just -- I believe it's four.

10  Q.  Did you look at the qualifications of the folks who ran the

11  numbers here and did the analysis for the potential objectors?

12  A.  The declaration I recall was from a woman named Miss

13  Hilton.  I want to say Kimberly Hilton, who apparently was --

14  had taken the bar and was pending a result --

15          THE COURT:  We know who she was.

16  BY MR. PEARLMAN:

17  Q.  So you used the term cherry picking in your supplemental

18  report.  What did you mean by that?

19  A.  Well, in theory again we're trying to get a class wide

20  average.  We want to get an understanding of the experience of

21  the group as a whole.  You can't take a person, especially a

22  person that's at almost the top of the list in terms of hours

23  worked, pick him and say everybody else is like him.  That just

24  doesn't make sense.  And that's not going to be representative

25  of the average.  In fact, it's not even typical of what most

1   class members' experiences are going to be.

2   Q.  Now, how did you calculate overtime premium pay?

3   A.  Overtime is calculated at half time since it's a piece rate

4   payment system.  So essentially you create the -- calculate the

5   hourly rate based on total earnings, divided by total hours

6   worked.  Then nonexempt employees are entitled to the half time

7   piece of the overtime premium.

8   Q.  Okay.  Just to put this in context so we all understand it,

9   typically are you looking at a time and a half premium in wage

10  and hour cases?

11  A.  It depends on the pay structure.  When it's piece rate pay

12  structure, there's specified rules.  If they were paid on an

13  hourly rate basis, you would do it time and a half.

14  Q.  So is the piece rate overtime premium less than the typical

15  premium of one and a half that you find in normal -- in other

16  sorts of FSLA cases?

17  A.  It can be significantly less.  Like 25 or 30 percent of

18  what the time and half premium would be.

19  Q.  Let's talk briefly about expense deductions.  Did you

20  estimate expense deductions?

21  A.  We estimated specific numbers, which we shared at the

22  mediation with both parties and also the mediator.

23  Q.  Are you familiar with the settlement formula upon which the

24  parties agreed?

25  A.  Yes, I am.

1   Q.  Okay.  Please explain to the Court how does that function.

2   A.  Well, you have two categories of issues -- of claims

3   potentially.  You have an overtime claim and we have an expense

4   claim.  What we've done is we took the total amount of

5   compensation since piece rate compensation existed throughout

6   the class period.  We assumed that productivity in terms of the

7   number of pieces completed was correlated with hours worked.

8   And that means the compensation indicated people with higher

9   levels of compensation also would have higher hours.  So by

10  tying the payment to the amount of compensation you had, that's

11  going to benefit the people with more hours than it's going to

12  take money away from people with fewer hours who were less

13  likely to have worked overtime.

14          With the expenses we've done the same thing.  So to

15  the extent we've got an actual number from both data sets, we

16  then applied that number to each person's percentage of the

17  total.  They got their pro rata share of the expense recovery.

18  Q.  So was the formula created in a way that serves as a proxy

19  for hours worked?

20  A.  A proxy for hours worked and it directly relates to the

21  expenses incurred.

22  Q.  So does the settlement reward folks who worked more than

23  folks who worked less?

24  A.  Yes, by definition.

25  Q.  Lastly, I want to talk with you about the mediation.  Were

1  you present at the mediation before this Court?

2  A.  Yes, I was.

3  Q.  What was your role?

4  A.  I served as an economics expert.  I explained my analyses

5  to the mediator, and we also shared information and data with

6  the mediator and with the plaintiffs.

7        MR. PEARLMAN:  Thank you, Mr. Crandall.  I'll tender

8  Mr. Crandall to Miss Willenson.

9        THE COURT:  Miss Willenson.  You can talk from there

10  if you want or you can come around.  It's up to you.

11                     CROSS-EXAMINATION

12  BY MS. WILLENSON:

13  Q.  Mr. Crandall, what information did you tender?

14  A.  We discussed my analysis of the randomly selected workweeks

15  and how we saw a pattern of wide variability.  We discussed the

16  implications statistically of a pattern of wide variability

17  that may have on class certification issues.

18  Q.  All right.  Did you offer numbers at the mediation?

19  A.  I certainly offered numbers related to the hours worked,

20  yes.

21  Q.  Did you offer your opinion of what the exposure might be at

22  the mediation?

23  A.  I did not offer a public opinion of my exposure.

24  Q.  Okay.  Did you make statements about what you thought the

25  case would be worth?

1          MR. PEARLMAN:  Now, I want to interpose an objection

2   for the record here.  One, pursuant to Federal Rule 408 and

3   also work product privileges.  Mr. Crandall's potential

4   assessment of what outside exposure is is not subject to

5   disclosure.

6          THE COURT:  Sustained.  And really nothing from the

7   settlement conference is either.

8          MS. WILLENSON:  All right.  Your Honor, but to be

9   clear on the record, we object to the Court's reliance in any

10  way on any information shared only in the settlement

11  conference.  There's no secret evidence in a Rule 23

12  proceeding.  So to the extent they don't want to disclose that

13  information, then we vigorously object to the Court's reliance

14  on anything that occurred.

15         THE COURT:  You can object as much as you want.

16  BY MS. WILLENSON:

17  Q.  All right.  Mr. Crandall, so to be clear, you are offering

18  no testimony on the adequacy of the amount of the settlement

19  funds?

20  A.  I'm not sure if I understand your statement.  Am I offering

21  testimony on whether or not it's a fair and arm's length

22  transaction?  What's your question?

23  Q.  No.  The question is whether you're offering any testimony

24  on the adequacy of the amount being paid to the putative class

25  members.

1    A.   Well, certainly if you're discounting for various people's

2    theory of what risk could be, I provided some hypothetical

3    numbers.   And if you were to discount for various risks, then

4    in theory this settlement seems more than fair if that's the

5    number you're at.

6    Q.   Okay.   You're offering no numbers, though, is that correct?

7    A.   I am not providing a public number in the open court

8    setting because it's counsel's work product, Counselor.

9    Q.   That's your view.   Your --

10              THE COURT:   You're not here to argue about that.

11              MS. WILLENSON:   I won't.

12              MR. PEARLMAN:   Objection.

13              THE COURT:   He just gave you the answer.

14   BY MS. WILLENSON:

15   Q.   You are not offering any numbers of any kind in this public

16   hearing --

17              MR. PEARLMAN:   Objection.

18   BY MS. WILLENSON:

19   Q.   -- or in your declarations?

20              MR. PEARLMAN:   Objection.   It's becoming

21   argumentative.

22              THE COURT:   Sustained.

23   BY MS. WILLENSON:

24   Q.   All right.   Can you look at your --

25              THE COURT:   That's why she's called an objector,

1  though.

2  BY MS. WILLENSON:

3  Q.  Actually you don't need to look at your own declaration.

4  I'll just ask so that the record is perfectly clear.   In

5  paragraph 14 of your supplemental declaration.

6           THE COURT:  Which is the second one, right?

7           MS. WILLENSON:  Correct.

8           THE COURT:  And what's the date of that, please?

9           MS. WILLENSON:  The date is -- it was filed on

10  October 12th, Your Honor.

11           THE COURT:  Thank you.

12  BY MS. WILLENSON:

13  Q.  It's document No. 1051.  We're looking at paragraph 14,

14  which is on page 8, the top of page 8.  You've said, I have not

15  provided an estimate of total exposure.  And that is still --

16  and today you haven't offered any estimate of total exposure?

17           MR. PEARLMAN:  Objection, asked and answered.  And

18  it's becoming argumentative.

19           THE COURT:  Sustained.

20  BY MS. WILLENSON:

21  Q.  You offered some testimony on the -- what the data may show

22  in your opinion that would affect the likelihood of a class

23  certification.  Do you recall that?

24  A.  Yes.

25  Q.  All right.  And in paragraph 14 of your declaration you say

1  you did not and have not said what the appropriate discount

2  percentages should be.  And that's still true today, correct?

3  A.  Well, the discount percentage is something that counsel

4  should decide upon, not me.

5  Q.  Right.  So you're offering no opinion even if you could on

6  what the percentage probability would be if the Court were to

7  apply a discount?

8  A.  Well, I'm a data analyst.  So if I have data to look at and

9  I can look at class certification decisions in this courthouse

10 or by whoever the class cert judge is going to be, if you could

11 look on average and see what their class cert record is, you

12 might offer a probability.  But I have not done that analysis.

13 Q.  Okay.  So you're not quantifying total exposure and you're

14 not quantifying any discount that should be applied?

15 A.  Well --

16     MR. PEARLMAN:  Objection.  This has been asked and

17 answered.

18     THE COURT:  I'll let you answer that, and then you

19 need to move on, Counsel.

20     THE WITNESS:  Let me just suggest one thing,

21 Counselor.  Obviously total exposure is highly related to the

22 amount of overtime hours worked.  And as I've told you and

23 testified now I think to Mr. Pearlman in direct, the amount of

24 overtime that was worked based on the analysis I have done

25 appears to be very minimal.  And it also appears that many

1  class members may have not worked any overtime at all.  So from

2  that perspective if you were to just extrapolate those

3  thoughts, you're not looking at a significant exposure

4  situation.

5  BY MS. WILLENSON:

6  Q.  Sir --

7           THE COURT:  Take your time.

8  BY MS. WILLENSON:

9  Q.  If the law -- withdrawn.

10          The Court allowed the question, Your Honor.  I'm just

11  going to ask it again.  I'm not getting a yes or no answer.  To

12  be clear you are not quantifying the net expected value of the

13  plaintiffs' claims were the litigation to continue?

14  Quantifying.  You're not quantifying that?

15  A.  Are you asking me if I'm quantifying the value if the

16  plaintiffs proceeded through trial, they achieve -- that means

17  they win class certification, they win a trial, they're able to

18  prove their damages.  Is that what you're asking?

19  Q.  Well, that's one question.

20  A.  I haven't taken all those steps.  The answer is I have not

21  taken all those steps.  What I have looked at is the overtime

22  hours potentially worked.

23  Q.  Okay.

24  A.  I have also examined the number of people and number of

25  workweeks that appear to have no overtime at all.  So to the

1    extent that those people -- how the Court decides to deal with

2    those people, if you have no overtime and your data when

3    reconstructed shows you have no overtime, are they entitled to

4    recover?  There's a lot of legal issues I think we'd have to

5    work through before you even quantify what a damages amount

6    would be if the class were to prevail all the way through at

7    the end of the line.

8    Q.   And you're not offering any opinion, any quantified

9    analysis?  Are you quantifying anything -- let me ask another.

10           You're a statistician, right?

11   A.   Yes.

12   Q.   Do you know what quantify means?

13   A.   I do.

14   Q.   What does quan -- I'm just -- what is your understanding of

15   the word quantify?

16   A.   Well, I think you're trying to misuse it in the context

17   that we have here.

18   Q.   What's your understanding of the word quantify?

19   A.   It's a numerical analysis.

20   Q.   Okay.  And are you offering any numerical analysis from

21   which the Court could conclude that the amount being paid, the

22   amount being paid to each subclass is adequate?

23   A.   Yes.

24   Q.   How much are those claims worth if you're quantifying?

25   A.   If you look at the overtime amounts that I've estimated,

1    they're worth very little, because many people may not have

2    worked overtime.  And to the extent that some people worked

3    overtime, it was not nearly as much as you put in your

4    declaration.

5    Q.  Okay.  In your opinion what are claims worth?  What do you

6    mean by very little?

7    A.  If you had no overtime, this is the case about whether or

8    not you worked more than 40 hours a week.  If you never worked

9    more than 40 hours a week, then by definition the value of

10   claim is zero.

11   Q.  Okay.  Have you ever offered any numerical range of what an

12   appropriate settlement might be?  Not hypothetical, actual

13   numbers.

14   A.  If the parties can --

15           MR. PEARLMAN:  I need to interpose an objection.  That

16   calls for a legal conclusion as well.

17           THE COURT:  No, you can answer that.

18           THE WITNESS:  If the parties understand the hours

19   worked and they understand the issue in terms of people

20   potentially not working any overtime at all, and they

21   understand that the people that did work overtime likely worked

22   very low overtime, they can run their own damages models, both

23   plaintiff and defendant, and estimate what those numbers are

24   going to be.  I'm not presuming what the plaintiffs did.

25   Obviously I looked at that situation, and I came up with some

1  relatively low numbers.  And then you also have the situation

2  which specifically quantified every expense.  So those parties

3  were both aware of all of those.  So you addressed that

4  directly.

5  BY MS. WILLENSON:

6  Q.  All right.  Have you quantified Mr. Perez's claims?

7  A.  Individually?

8  Q.  Correct.

9  A.  I have not examined Mr. Perez individually other than

10  looking at his data that was produced in connection with your

11  declaration.

12        MS. WILLENSON:  I have nothing further, Your Honor.

13        THE COURT:  All right.  Okay.  Any redirect?  Any

14  questions, Counsel?  Plaintiffs' counsel.

15        MR. BETZEN:  No, Your Honor.

16        THE COURT:  Okay.  You may step down.  Thank you very

17  much.

18     (Witness excused.)

19        THE COURT:  Well, that's it.  Thank you all very much.

20  We'll take it under advisement.

21        MS. WILLENSON:  Your Honor, we -- a couple things.

22  We'd make a -- we would like to make an offer of proof if the

23  Court would allow on the testimony that we weren't able to

24  offer.  We had asked to present the other two class

25  representatives as adverse witnesses.  I didn't have an

1    opportunity to examine Mr. Barth on the issue that I think is

2    most relevant to class certification.

3            THE COURT:  Which is?

4            MS. WILLENSON:  The circumstances surrounding his

5    addition as a plaintiff.

6            THE COURT:  You make all these statements and then

7    when I ask you a question, you can't answer them.

8            MS. WILLENSON:  I don't think that's what the record

9    reflects, Your Honor, at all.

10           THE COURT:  You don't?

11           MS. WILLENSON:  I disagree.  I think I have --

12           THE COURT:  Of course you do.

13           MS. WILLENSON:  -- adequately answered every single

14   question that you have put to me.

15           THE COURT:  Well, I disagree with you on that.

16           MS. WILLENSON:  Okay.  Well, I think that we can

17   disagree about what the record reflects, but I don't think

18   that's a reason to not allow us to have presented the witnesses

19   we asked to present.

20           THE COURT:  What witnesses did you ask to present?

21           MS. WILLENSON:  We asked to present --

22           THE COURT:  I asked if anybody else was going to ask

23   any more questions.  You didn't raise any.

24           MS. WILLENSON:  Your Honor, we filed a witness list,

25   and Your Honor --

```
 1              THE COURT:  Where are they?

 2              MS. WILLENSON:  You precluded -- you entered an

 3    order --

 4              THE COURT:  That's exactly right.

 5              MS. WILLENSON:  You entered an order denying us the

 6    opportunity to present those witnesses.  We presented a witness

 7    list, and you denied, you denied our request.

 8              THE COURT:  You've said that three times now.

 9              MS. WILLENSON:  Okay.  So I would request an

10    opportunity to make an offer of proof on what evidence we

11    believe would have been elicited through the questioning that

12    we wanted to conduct.

13              THE COURT:  Why haven't you done that up to this

14    point?

15              MS. WILLENSON:  I don't understand, Your Honor.  I'm

16    sorry.  I'm offering to make an offer of proof on something we

17    have not been allowed to do.  I'm doing it now.  I'm not sure

18    when I --

19              THE COURT:  What is it you're going to tell the Court

20    or what's your offer that's not duplicative of what we've

21    already heard --

22              MS. WILLENSON:  Not in this --

23              THE COURT:  -- or read?

24              MS. WILLENSON:  Well, I'd have to address that

25    specifically with the witnesses, and that would require me to
```

1    actually make the offer of proof.

2         THE COURT:  Well, that's fine.  You can make your

3    offer of proof verbally right now if you want to.

4         MS. WILLENSON:  Well, that's what I wanted to do.  I'm

5    sorry if it wasn't clear.  I don't --

6         THE COURT:  Let's go.

7         MS. WILLENSON:  Okay.  So I would --

8         THE COURT:  There's a lot of things that you've said

9    haven't been clear here today.

10        MS. WILLENSON:  Pardon?

11        THE COURT:  I said there is a lot of things that you

12   have said that have not been clear here today --

13        MS. WILLENSON:  Well, that's the Court's --

14        THE COURT:  That's why I'm asking these questions.

15   And don't interrupt me when I'm trying to say something,

16   please.  At least give the Court the courtesy of that.

17        MS. WILLENSON:  I apologize, Your Honor.  So am I --

18   are you permitting me to make the offer?

19        THE COURT:  Yes.  Yes.

20        MS. WILLENSON:  Had we been permitted, we would have

21   continued the questioning of Mr. Barth.  We were not permitted

22   an opportunity to question him on the circumstances surrounding

23   his addition as a named plaintiff.

24        THE COURT:  Mr. Barth is not on trial here.

25        MS. WILLENSON:  I agree he's not on trial, Your Honor,

1    but there are unique circumstances presented here which reflect

2    collusion between the parties in the adding Mr. Plaintiff --

3    Mr. Barth --

4            THE COURT:  And you've said that in your submissions.

5            MS. WILLENSON:  And we had no opportunity to direct

6    questions to Mr. Barth.

7            THE COURT:  But Mr. Barth is not the one who's being

8    accused of collusion.  Right?

9            MS. WILLENSON:  Absolutely, Your Honor.  He really

10   hasn't been accused of anything.

11           THE COURT:  All right.

12           MS. WILLENSON:  So but that doesn't mean we shouldn't

13   have an opportunity --

14           THE COURT:  Get to your point, please.

15           MS. WILLENSON:  The fact that he's not being accused

16   of collusion doesn't mean that we shouldn't have an opportunity

17   to ask him questions and elicit testimony which would be

18   pertinent to the Court's inquiry as to whether there was

19   collusion between the defendants and the plaintiffs in adding

20   Mr. Barth as a plaintiff.

21           THE COURT:  And the Court disagrees with your analysis

22   of that.

23           MS. WILLENSON:  All right.  We would have asked Mr.

24   Barth to articulate his view on why he should receive a $5,000

25   incentive payment.  We would have asked --

1          THE COURT:  What does that have to do with any of

2   this?

3          MS. WILLENSON:  Because we're objecting to the

4   incentive payments.

5          THE COURT:  What does his view have to do with this?

6          MS. WILLENSON:  Well, I think he should be able to

7   articulate why it is he should get a $5,000 incentive payment

8   when his service to the class consisted of two days.  He was

9   added to the case, Your Honor, the day before the settlement

10  conference.  He went to the settlement conference and he

11  received a $5,000 incentive payment.  We also would have

12  questioned Mr. Barth as to --

13         THE COURT:  Has he received anything yet?

14         MS. WILLENSON:  He's -- under the proposed settlement

15  he would receive a $5,000 incentive payment.  We would have

16  questioned Mr. Barth.  In questioning him about the

17  conversation that he had with Mr. Betzen, we would have

18  questioned him about whether Mr. Betzen in that --

19         THE COURT:  And you had the opportunity to question

20  Mr. Betzen about that.

21         MS. WILLENSON:  And my questioning was cut off, Your

22  Honor.  We would have --

23         THE COURT:  Because you got into privileged

24  communications.

25         MS. WILLENSON:  I disagree, Your Honor.  And we -- so

1   we would have questioned Mr. Barth on whether in his

2   conversation with Mr. Betzen he was -- there was any

3   representation made about the amount of money that he might

4   recover, he might secure as a class representative as an

5   incentive payment.

6           Had we been permitted to offer the testimony of Mr.

7   Ellis, Mr. Ellis would have testified that on a prior occasion

8   he was offered -- there were representations made that if he

9   agreed to be a named plaintiff, he would be offered a 3 to

10  $5,000 incentive payment.  So we would have elicited that

11  testimony.

12          I also wished to question Mr. Butler to establish what

13  is reflected in the record, that he never worked as an

14  independent contractor for ACT except for one week when he was

15  a ride out trainee and worked 20 weeks.  So that there would be

16  no basis to have him serve as a representative of the

17  independent contractor subclass.  And as we've heard today,

18  Your Honor, there isn't even clarity on who's being posed as a

19  class representative for each of these subclasses.  But

20  certainly I would have wanted to make that fact clear in the

21  record because there's been some dispute about it.

22          THE COURT:  Is that it?

23          MS. WILLENSON:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MS. WILLENSON:  And we would also request an

1    opportunity to submit proposed findings, because --

2        THE COURT:  Well, I'll decide whether we want that and

3    we'll issue a minute order to reflect that.  Okay.  Did you

4    have anything that you wanted to say, sir?

5        MR. BETZEN:  Nothing beyond the fact that we obviously

6    believe Miss Willenson's closing here mischaracterizes the

7    testimony to date.

8        THE COURT:  Mr. Pearlman.

9        MR. PEARLMAN:  Thank you, Your Honor.  I just want to

10   make a concluding remark that I believe that a very detailed,

11   thorough, robust, and vigorous mediation was conducted under

12   this Court's auspices.  I believe that the objectors failed to

13   recognize that under Rule 23 they can simply opt out rather

14   than try to destroy a settlement that's actually quite

15   favorable both to them and to the individuals who are

16   comprising the putative settlement class.

17       And I can't reiterate enough that the fact that the

18   objectors filed a mirror lawsuit eight months after the lawsuit

19   in this case was filed is questionable and exposes the motive

20   for the objections in this case.  Thank you, Your Honor.

21       THE COURT:  Anything else?

22       MS. WILLENSON:  Well, I don't know if Your Honor would

23   like me to respond to that last comment.

24       THE COURT:  No, I really don't.  I don't want you to

25   respond.  Is there anything else that you forgot that you want

1   to bring up at this time?

2          MS. WILLENSON:  Not that I can recall, Your Honor.

3          THE COURT:  Now, what was it that you asked that you

4   could have --

5          MS. WILLENSON:  If we could submit proposed findings

6   because --

7          THE COURT:  Findings of what?

8          MS. WILLENSON:  Of fact.

9          THE COURT:  No.  You can submit your conclusions of

10  law if you want.  Are you interested in doing that?  What is it

11  that you're shaking your head about?

12         MS. WILLENSON:  Well, I just didn't anticipate that,

13  Your Honor.

14         THE COURT:  I'm sorry that you didn't anticipate that.

15         MS. WILLENSON:  I've never actually submitted proposed

16  conclusions of law without submitting the proposed findings of

17  fact.

18         THE COURT:  Well, here's your opportunity to do that.

19         MS. WILLENSON:  Okay.  Yes, Your Honor, I'd like that

20  opportunity.

21         THE COURT:  I'm told that the transcript will be

22  prepared -- you tell me what -- three weeks?  Two weeks.  How

23  many do you want after that?

24         MS. WILLENSON:  Three weeks, Your Honor.

25         THE COURT:  Three weeks beyond the --

1      MS. WILLENSON:  There's very little I can do until I

2  receive the transcript, Your Honor.

3      THE COURT:  Right.  But you want three weeks beyond

4  that?

5      MS. WILLENSON:  I would like 21 days after receipt of

6  the transcript to prepare the proposed conclusions.

7      THE COURT:  Okay.  I have no problem with that.  Same

8  thing for all of you, and you're to submit those

9  simultaneously.  Okay.  No findings of fact.  Just the

10  conclusions of law.

11      MR. PEARLMAN:  Thank you.

12      THE COURT:  Okay.  Thank you all very much.

13      MR. BETZEN:  Thank you, Your Honor.

14      MS. WILLENSON:  Thank you, Your Honor.

15                     CERTIFICATE

16      I HEREBY CERTIFY that the foregoing is a true, correct

17  and complete transcript of the proceedings had at the hearing

18  of the aforementioned cause on the day and date hereof.

19

20  */s/TRACEY D. McCULLOUGH*          *April 26, 2011*

21  Official Court Reporter                Date
    United States District Court
22  Northern District of Illinois
    Eastern Division

23

24

25